**Bruce M. STARGATT, as Receiver for McDonnell & Co., Incorporated, a Delaware corporation in Receivership, Plaintiff,**

v.

**Richard Keeler AVENELL, citizen of Great Britain, and named representative of underwriters appearing on behalf of individual members of Lloyd's Syndicate Writing Policy No. CU10264, et al., Defendants.**

**Civ. A. No. 4357.**

United States District Court,
D. Delaware.

May 12, 1977.

Bruce M. Stargatt, Jack B. Jacobs and Doris M. Toll, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

James M. Tunnell, Jr., David A. Drexler and William H. Sudell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

STAPLETON, District Judge:

This action is brought by Bruce M. Stargatt, Receiver for McDonnell & Company (hereinafter "McDonnell") to recover on claims under two excess insurance policies issued by defendants to McDonnell. Prior to being placed in receivership, McDonnell was a member firm of the New York Stock Exchange and was engaged in the securities brokerage business, with its principal offices located in New York City. Defendants are members of a number of Lloyd's of London syndicates which wrote the policies at issue. The terms and conditions of the two policies are essentially the same except with respect to policy limits.

This action was originally brought against Fidelity and Casualty Company of New York (hereinafter "Fidelity"), the primary insurer, and the first excess insurers. As a result of a settlement agreement, plaintiff's claims against Fidelity were dismissed by Order of this Court on December 2, 1974. On July 16, 1975 this Court denied the first excess insurer's motion for summary judgment, in support of which they had argued that by settling with Fidelity, the primary insurer, plaintiff had not exhausted the primary policy's coverage, thereby relieving the first excess insurers of any liability.[1] On April 29, 1976 the Court permitted plaintiff to amend the complaint to add the excess insurers under the second excess policy. Both sides have now moved for summary judgment and have filed extensive briefs and affidavits in support of those motions.

The excess insurance policies provide for the following coverage:

. . . [I]n consideration of the payment of a charge of $5,000.00 (FIVE THOUSAND DOLLARS), the receipt of which is hereby acknowledged, the Insurers hereby undertake and agree to indemnify MCDONNELL & CO. INCORPORATED, New York, N.Y., and as set forth herein, (herein called the "Assured"), and to hold said Assured harmless within the limits herein stated, from and against all such loss or liability as the

---

1. *See Stargatt v. Fidelity and Casualty Co. of New York,* 67 F.R.D. 689 (D.Del.1975).

Assured may during the policy period of twelve (12) calendar months from 7th day of July, 1968 12.01 a. m. Standard Time incur or sustain or discover that it has incurred or sustained by reason of any claim or claims which may be made against the Assured under any provision or provisions of the Federal Securities Act of 1933, or any past or future amendments thereof (herein referred to as the "Securities Act of 1933") or the Federal Securities Exchange Act of 1934, or any past or future amendments thereof, (herein referred to as the "Securities Exchange Act") or of the common or statutory law of any state or of the United States pertaining to the sale of securities, all as more fully described in the Securities and Exchange Act policy (hereinafter called the "Primary Policy") issued by the Fidelity and Casualty Company of New York.

Each policy also provides that it is "subject to the same terms, conditions, exclusions and stipulations (except as regards the premium and except as otherwise provided herein) as are contained in the primary policy".

Under the primary policy the upper limit of coverage is $250,000, subject to a $50,000 deductible provision for any one issue of securities, whether made up of one or more claims. The first excess policy provides for coverage up to $750,000 in losses after the primary coverage is exhausted. The second excess policy provides for coverage up to $2,000,000 after the primary and first excess coverage are exhausted.

Plaintiff here has sued to collect on twelve different claims alleged to be covered under the excess insurance policies. Defendants have asserted defenses as to each claim. The facts surrounding each claim will be stated briefly below.

## I. THE MARGARET MARY McDONNELL MURPHY CLAIM.

This claim arises out of a lawsuit encaptioned *Margaret Mary McDonnell Murphy v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Southern District of New York, 71 Civ. 461R. 0). In her complaint Murphy alleged that in February 1969 she was fraudulently induced to subordinate her investment account with McDonnell. Later during the summer of 1969 Murphy was requested by officers of McDonnell to enter into a second agreement with the company. By the terms of the agreement, fifty percent of the value of the securities subject to the subordination agreement were to be converted into preferred stock of McDonnell and the remainder, if necessary to comply with the rules of the New York Stock Exchange, would be exchanged for a five year installment note of McDonnell. Murphy entered into the second agreement on September 30, 1969. In October, 1969 fifty percent in value of the securities in Murphy's subordinated account were exchanged for preferred stock of McDonnell. Thereafter, according to Murphy's complaint, the remaining securities in her subordinated account were "wrongfully and unlawfully converted" for a five year subordinated installment obligation of McDonnell.

This action was consolidated for trial with the *Anna and James McDonnell* action, to be described below. A jury verdict in the amount of $300,000 for Murphy was later reduced by the Court to $282,623, being the value of Murphy's account as of February, 1969, when the original transaction took place.

## II. THE ANNA AND JAMES McDONNELL CLAIM.

This claim arises out of a lawsuit encaptioned *Anna M. McDonnell, et al. v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Southern District of New York, 71 Civ. 1940). Anna and James F. McDonnell, Jr. as trustees of a testamentary trust created by James F. McDonnell, Sr., brought this suit to recover a trust asset consisting of a Series B registered subordinated debenture of McDonnell & Company in the amount of $318,622.97 due on December 31, 1968. According to the complaint the debenture was not paid upon maturity, but instead was "wrongfully

and unlawfully converted" into a Series E registered subordinated debenture, due on December 31, 1978. It was alleged that plaintiff-trustees were not made aware of McDonnell's capital problem when the debenture was converted and were not advised of the "roll over" in debentures until sometime in the summer of 1969, when they demanded payment to no avail. Plaintiffs asserted that these acts by McDonnell operated as a fraud and deceit upon them and claimed for the estate $318,622.97 plus interest from the maturity date.

This case was consolidated for trial with the *Murphy* claim, described above. A jury verdict in plaintiffs' favor was awarded in the amount of $350,000 which was subsequently reduced by the court to $318,622.97. Judgment plus interest was awarded in the amount of $372,596.18.

### III. THE BEEBE CLAIM.

This claim arises out of a lawsuit filed April 29, 1970 in the United States District Court for the Northern District of Illinois by three employees of McDonnell (Messrs. Beebe, Gay and Terrill) against McDonnell and its officers and directors. The complaint alleged that during December, 1968 and January, 1969, plaintiffs accepted offers from McDonnell to purchase shares of its voting and non-voting common stock. Plaintiffs further alleged that they were induced to purchase the stock by the fraudulent acts of McDonnell and its officers and directors in violation of the Securities Act of 1933, the Securities Act of 1934, the Illinois Securities Act of 1953, and the common law of the State of Illinois. Plaintiffs also alleged that defendants had violated the registration requirements of the Securities Act of 1933 and the Illinois Securities Act of 1953.

After a non-jury trial, the court found that McDonnell and two of its officers (T. Murray McDonnell and Morgan McDonnell)

had violated Rule 10b–5 promulgated by the Securities & Exchange Commission under Section 10(b) of the Securities Exchange Act of 1934 and that the defendants had not complied with the applicable federal and state registration and qualification requirements. Judgment was entered against McDonnell and the two officers for the full amount of the stock purchase price, plus interest, attorneys fees and costs.[2]

### IV. THE GREEN CLAIM.

This action encaptioned *Leonard I. Green v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Northern District of Illinois, Civil Action No. 71C–1387) was filed on June 9, 1971 and was ultimately consolidated for trial with the *Beebe* action. As in *Beebe*, Green's causes of action arose out of purchase by him of voting and non-voting common stock of McDonnell. He, too, alleged that he was induced to purchase the shares as a result of the fraudulent conduct of McDonnell and its officers and directors in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934. He also alleged that the anti-fraud provisions of the Illinois Securities Law and the registration requirements of those laws were violated. He sought rescission and repayment of the full purchase price of his shares together with attorney's fees and costs. Judgment was entered against McDonnell and two of its officers in the amount of $72,150 plus costs of the action.[3]

### V. THE BAND CLAIM.

This claim arises out of an action entitled *Oscar U. Band v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Eastern District of Michigan, Civil Action No. 35893), filed on January 6, 1971. The essence of this suit was the alleged fraudulent sale by McDonnell of its stock to one of its employees in late 1968.

---

**2.** The full amount paid for the McDonnell stock by Beebe, Terrill and Gay was $55,825. Of this amount all but $3,325 has been paid by defendant Morgan McDonnell. This case was consolidated for trial with the *Green* case to be discussed below. Fees and disbursements for the trial of both claims amounted to $26,917.85.

**3.** As noted above, the Green costs and Beebe costs together amounted to $26,917.85.

Band, who had purchased 400 shares of McDonnell's non-voting common stock, alleged violations of the federal securities laws, the securities laws of the State of Michigan, and common law fraud. Band sought to have the purchase transaction rescinded and to recover the full amount he paid for the share plus interest from the date of purchase. After a non-jury trial, the District Court found the sale of stock to Band was in violation of Rule 10b–5 and Section 10(b) of the Securities Exchange Act of 1934, that the company failed to disclose information and made certain affirmative representations upon which Band relied, and that Band was entitled to judgment in the amount of the purchase price. Judgment was entered against McDonnell and two of its former officers for $28,632 plus interest from the date of suit. In addition to indemnification for the amount of the judgment, McDonnell claims entitlement to the attorney's fees and disbursements incurred in defending the lawsuit in the amount of $6,916.07.

## VI. THE SOBEL CLAIM.

This claim arises out of a suit filed on February 12, 1970 by six former employees of McDonnell who in the latter part of 1968 purchased a total of 1,300 shares of McDonnell non-voting common stock. The claim was encaptioned *Marvin L. Sobel, et al. v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Central District of California, Civil Action No. 70–339–JWC). The *Sobel* plaintiffs alleged that they were induced to purchase McDonnell stock in late 1968 in violation of federal securities law, California securities law and by reason of common law fraud. The plaintiffs sought rescission of the stock purchase transactions. The claim is identical in nature to *Beebe, Green* and the other suits involving the sale of McDonnell securities during the coverage period of the policies.

Unlike the other similar stock rescission cases which went to trial, the *Sobel* case was settled by agreement among the parties. Under the terms of the settlement agreement, the *Sobel* plaintiffs were al-lowed general creditor claims against the receivership estate in the amount of $69,-790.50. In addition to these claims, McDonnell seeks to recover from the excess insurers attorney's fees and disbursements expended in defense of the action in the amount of $9,797.26.

## VII. THE MARK CLAIM.

This claim arises out of a suit filed by Gordon Mark in the United States District Court for the Northern District of Illinois against McDonnell, several of its officers and directors, the New York Stock Exchange and the President of the Exchange. Mark claims that on January 30, 1969, while he was an employee of McDonnell, he purchased 500 shares of the company's non-voting common stock for which he paid the company $38,005 in cash and loaned it 4,301 shares of American Home Products Company common stock. The American Home Products shares were loaned pursuant to a subordination agreement between Mark and McDonnell. Plaintiff's complaint alleged various violations of the Securities Exchange Act of 1934, the Securities Act of 1933, the Illinois Securities Law of 1953, and common law fraud.

On plaintiff's motion for summary judgment, the District Court ordered the transaction rescinded on the grounds that McDonnell had violated the Illinois Blue Sky Law by its failure to register the stock and ordered the return to Mark of the stock purchase price plus 4,301 shares of American Home Products. The order granting the motion for summary judgment was affirmed by the Court of Appeals for the Seventh Circuit and is reported at *Mark v. McDonnell & Company,* 447 F.2d 847 (7 Cir. 1971).

Plaintiff seeks to recover from defendant insurers the cash judgment of $80,539.96 and $331,177 which represents the cash value of 4,301 shares of American Home Products which were delivered to Mark. In addition to its liability to Mark, McDonnell makes claim for fees and disbursements in the amount of $42,066.45.

## VIII. THE COHIG CLAIM.

This claim arises out of an arbitration complaint before the American Stock Exchange filed by James C. Cohig and seven other purchasers of various amounts of McDonnell's voting common stock and non-voting common stock. As in many of the other cases, these purchases were made late in 1968. The claimants alleged in their complaint that they had been misled by McDonnell and its officers into purchasing the shares in violation of federal securities laws and the securities laws of various states. Unlike the other claims so far mentioned, claimants in this case were unsuccessful. Plaintiff's claim here is for the attorney's fees and disbursements of $15,770.99 incurred in the defense of this proceeding.

## IX. THE RAWAK CLAIM.

This claim arises out of a lawsuit encaptioned *William A. Rawak, et al. v. McDonnell & Company, Incorporated, et al.,* (United States District Court for the Eastern District of Pennsylvania, Civil Action No. 70–3012). That suit was similar to the others described above which involve the sale of McDonnell common stock to its employees. In this case four employees sued to rescind purchases of McDonnell non-voting common stock which each of them had made from the company. As in the *Cohig* case, plaintiffs were unsuccessful. McDonnell's claim against the excess insurers is for the fees and disbursements incurred in defending this action, $1,252.

## X. THE NOTZ CLAIM.

This claim arises out of an action entitled *Peter Notz v. McDonnell & Company, Incorporated, and Francis B. Farr,* (United States District Court for the Southern District of New York, 71 Civ. 1873). That suit was factually dissimilar from any of those thus far described.

Notz alleged that he opened a discretionary account with McDonnell at defendant Farr's suggestion, Farr being at that time an employee of McDonnell. On January 1, 1969 the portfolio in Notz's account had a value in excess of $1,000,000. According to the allegations of the complaint, beginning on January 1, 1969 and continuing until September 30, 1969, defendants "churned" plaintiff's account to the extent that during the period they initiated 533 transactions, turning over the portfolio in the account fourteen times. As a result, Notz claimed to have lost $1,150,000.

This action was settled pursuant to an agreement dated January 30, 1974 whereby Notz was permitted a general creditors claim in the receivership action in the amount of $80,000. Plaintiff's claim is for $83,697.50, representing the amount of the allowed claim and attorney's fees and disbursements.[4]

Defendants assert numerous defenses, some applicable to several claims, and others peculiar to only one. I will deal first with the generally applicable defenses and then deal with the remaining individual ones.

## THE DISHONESTY EXCLUSION

Defendants assert that the *Murphy, Anna* and *James McDonnell, Beebe, Green, Band,* and *Sobel* claims are excluded from coverage by the following provision of the primary policy, incorporated by reference in the excess policies:

THIS CONTRACT DOES NOT COVER:

Any loss, liability, costs or expenses arising by reason of any dishonest or criminal act on the part of the Insured, or of any employee or officer thereof, whether acting alone or in collusion with others, or within or without the usual scope of his duties but the Company shall not decline to hold the said Insured harmless in any civil suit brought against the

---

4. The allegations of the two remaining claims, the Advance Insurance claim and the Revenue Properties claim are not discussed in the complaint, the briefs, or the affidavits. Plaintiff's claim in both is for the attorney's fees incurred in defending the suits, $6,593.86 in the case of the Advance Insurance claim and $3,338.45 in the case of the Revenue Properties claim.

Insured because such suit is based on an allegation of the violation of the criminal sections of the Securities Act of 1933 or the Securities Exchange Act, or of the common or statutory law as aforesaid, provided that the Company shall not be liable for any loss as such resulting from a conviction obtained in any criminal proceedings.[5]

Defendants argue that the claim in each of the above cases is excluded from coverage under the policies because each arose by reason of fraudulent conduct on the part of McDonnell. Underlying this contention is defendants' argument that the "Excess Insurers would not put themselves in the position of guaranteeing the success of fraudulent schemes by McDonnell.[6] Plaintiff initially counters that all three clauses of this exclusion must be read together and that, when they are so read, the only losses, liabilities, or expenses excluded are those which arise from a criminal conviction. Since none of the claims in question resulted from a finding of criminal responsibility, plaintiff argues, none should be excluded from coverage under the policy.

While the language of this exclusionary provision may leave some room for argument, I think it quite clear that plaintiff's construction is unacceptable. It is simply unreasonable to suppose that a draftsman setting out to exclude coverage for fines imposed and expenses incurred as a result of a successful criminal prosecution would have gone about his task in such a roundabout manner.

■ There is a far more reasonable explanation of the draftsman's intent. The first clause is intended to exclude from coverage any loss, liability, or expense, which the insurer can establish has arisen from a "dishonest or criminal act" on the part of the insured. The second clause does not give back, as plaintiff suggests, almost all that the first clause has taken away. Rather its function is to preclude the insurer from disclaiming coverage for any loss, liability or expense arising from civil litigation *solely* on the ground that the act giving rise to the suit and resulting liability constitutes a criminal violation of a federal or state securities law. It does *not* have the effect of restoring to the area of coverage any loss resulting from a "dishonest" act. Its purpose is rather to provide coverage with respect to acts which, although honest, may nevertheless constitute criminal violations of securities laws.

The importance of this clause can be appreciated when one understands the close correlation between civil and criminal liability under the 1933 and 1934 Acts. Section 24 of the Securities Act and Section 32(a) of the Exchange Act make it a criminal offense, "wilfully" to violate any provision of these Acts or any of the Commission's rules promulgated thereunder. When the broad scope of these criminal sections is considered in light of the existing case law suggesting that one may act "wilfully" without evil intent,[7] it becomes apparent that an across-the-board exclusion for criminal acts, like the one contained in the first clause of this provision, would seriously undermine the basic coverage of the policy in the absence of a provision, like that in the second clause, concerning honest, though criminal, acts.

---

5. Defendants also contend that the attorney's fees incurred by plaintiff in successfully defending both the *Cohig* and the *Rawak* actions are also excluded from coverage in part because those actions are based on allegations of dishonest acts by McDonnell. Since the above exclusion would have precluded recovery from the excess insurers had McDonnell been found to have engaged in dishonest acts, defendants argue, attorney's fees incurred in defending McDonnell against charges of dishonest behavior must also be excluded.

6. See defendants' opening brief at 32–33. Defendants also contend that even if the excess policies were read to permit coverage on claims arising out of McDonnell's fraudulent acts, public policy would preclude the courts from giving effect to such a contractual arrangement. In view of my interpretation of the exclusionary language in question, I need not address that issue here.

7. *See United States v. Sussman*, 37 F.Supp. 294 (E.D.Pa.1941); III *Loss, Securities Regulation*, 1986–7 (1961).

When the second clause is assigned its proper role, the intent of the third clause becomes apparent. Even though the insurer may not deny coverage in civil litigation for loss arising from honest, though criminal, acts, it is not to be responsible for expenses or fines arising from a successful criminal prosecution, whether the relevant act was "honest" or "dishonest".

■ The crucial question remaining is whether the liability incurred as a result of any of the above claims arose out of "dishonest" acts as that term is used in the policy. The term is not one of art in this context and it is, accordingly, appropriate to turn to the lexicographers. *Webster's New World Dictionary*, (copyright 1972) defines "dishonest" as "not honest, lying, cheating, etc.". Under synonyms it explains that "dishonest implies the act or practice of telling a lie or of cheating, deceiving, stealing, etc." Deceitful "implies an intent to make someone believe what is not true, as by giving a false appearance, using fraud, etc.", while lying "suggests only the act of telling a falsehood".

*Black's* defines "dishonesty" as "[d]isposition to lie, cheat, or defraud; untrustworthiness, lack of integrity". Defraud, according to *Black's*, means to "practice fraud; to cheat or trick . . . to deprive a person of property or any interest, estate or right by fraud, deceit or artifice." Lie may mean "an untruth deliberately told", "an intentional misstatement", or "the uttering or acting of that which is false for the purpose of deceiving".

■ There can be no doubt that the claims which plaintiff presses as a result of the *Beebe, Green* and *Band* cases are excluded from the policy coverage when the term dishonest is given its common, everyday meaning. In each of these cases, the Court found as a fact that McDonnell's authorized agents in connection with sales of its common stock to the plaintiffs had intentionally disclosed and withheld information in such a manner as to create a misimpression of the facts concerning the financial and business position of McDonnell. The Court's findings of fact make it clear that McDonnell's officers acted deliberately, knew the impression being conveyed was false in material respects, and intended that this misimpression be relied upon by plaintiffs in deciding whether or not to buy. Thus, these are classic cases of judgments arising from dishonest acts.[8]

A similar conclusion must be reached with respect to the *Murphy* and *McDonnell* claims. Mrs. Murphy alleged in her complaint that she was fraudulently induced to enter an agreement subordinating her investment account. In the words of the Court, the judgment ultimately awarded to her was for "the value of the securities the jury found to be obtained by fraud."[9]

Anna and James F. McDonnell, Jr., as trustees of a testamentary trust created by James F. McDonnell, Sr., alleged that the McDonnell firm wrongfully converted from the James McDonnell Estate a registered subordinated debenture Series B of McDonnell & Company due December 31, 1968, and issued in its stead a registered subordinated debenture Series E due December 31, 1978. The complaint alleged that this conversion effected by McDonnell's chief executive officer was for its benefit without notice to the plaintiffs, even though, as one of the trustees, he knew that the trust instrument required approval by a majority of the trustees. The jury verdict against McDonnell on this claim indicates that these basic facts must have been established to its satisfaction. Assuming this judgment arose from a securities act claim, as plain-

---

**8.** It is true, as plaintiff stresses, that the Court's "Conclusions of Law" in the *Beebe* and *Green* cases recites that there had been no showing that McDonnell or its officers had "intended to cheat or defraud each or any of the plaintiffs". Pl. Appendix, Document 13. When this conclusion is read along with the Findings of Fact, however, one can attribute to it only a view on the part of the Court that the defendants hon-

estly believed McDonnell would recover from its undisclosed distress and that plaintiffs would, therefore, suffer no loss. This does not make the deliberate and material representations something less that dishonest acts.

**9.** Def. Appendix C.

tiff contends, I believe it also arose from a "dishonest" act as that term is used in the exclusionary clause.

■ The remaining claims alleged to come within the exclusion present somewhat different questions. Although the allegations against the insured in the *Sobel* complaint were "identical in nature to *Beebe, Green,* and the other suits involving the sale of McDonnell securities during the coverage period of the policy,"[10] McDonnell's civil liability arose not from a finding that it had violated Section 10(b) but rather from a settlement agreed upon by the parties. The settlement itself is not sufficient proof that McDonnell engaged in dishonest acts and there is nothing else provided in the current record from which this Court could conclude that the civil liability in the *Sobel* claims arose from dishonest acts by McDonnell with respect to the *Sobel* plaintiffs. The fact that other plaintiffs were successful against McDonnell on similar claims is not sufficient to establish that liability on the *Sobel* claim arose out of McDonnell's dishonest acts, especially in view of the fact that other plaintiffs, who pressed similar claims,[11] were not successful. This is not, of course, to say that the insurer cannot hereafter prove that this "liability" arose from dishonest acts. It does mean, however, that summary judgment is not now appropriate on this ground for either side.[12]

■ Although the *Rawak* and *Cohig* claims were based on allegations similar to those in *Sobel,* the plaintiffs were not successful in proving violations of federal and state securities laws or of common law

fraud. I agree with plaintiff that the mere presence of allegations of fraud in the complaints does not mean that recovery of the attorney's fees expended in litigating these claims is barred by the exclusionary clause. Moreover, I conclude that defendants' failure to file affidavits in opposition to those of plaintiff in connection with these claims entitled plaintiff to summary judgment with respect to the issue of exclusion.[13]

This Court thus concludes that the excess insurers are entitled to summary judgment with respect to any loss, liability or expense incurred with respect to the *Murphy, McDonnell, Beebe, Green* and *Band* claims. It also concludes that plaintiff is entitled to summary judgment with respect to the litigation expenses incurred in defending against the *Cohig* and *Rawak* claims. This leaves only the *Sobel, Mark* and *Notz* claims for further consideration in light of the other contentions of the parties.

## INADEQUATE NOTICE

Defendants deny liability under the *Mark* and *Sobel* claims on the ground that the insured failed to comply with the notice provisions of the policy. The primary policy provides that the company shall not be liable to the insured unless the insured complies with certain conditions one of which is the following:

> The Insured upon receipt of affirmative written advices of any act committed in violation of any provision of the said Act or Acts, or common or statutory law, or of any allegation of such violation, shall give immediate written notice thereof with the fullest information ob-

10. See plaintiff's brief at 13.

11. I. e., Cohig and Rawak.

12. The excess insurers were not consulted about this settlement. I agree with plaintiff, however, that, having denied coverage in September of 1970, defendants are in no position to complain about not being consulted on a settlement consummated in 1974. *See* 14 Couch 2d, § 51:54. *Also see Mitchell v. Lindstrom,* 12 A.D.2d 813, 209 N.Y.S.2d 923 (1961); *Matter of Empire State Sur. Co.,* 214 N.Y. 553, 108 N.E. 825 (1915); *Cardinal v. State of New York,* 304 N.Y. 400, 107 N.E.2d 569 (1952),

*motion for rearg. denied* 304 N.Y. 732, 108 N.E.2d 400 (1952), *motion for remittitur denied* 304 N.Y. 875, 109 N.E.2d 885 (1952), *cert. denied sub nom. State of New York v. Cardinal,* 345 U.S. 918, 73 S.Ct. 729, 97 L.Ed. 1351 (1953).

13. The only other contention made in defense against these claims is that the *Cohig* and *Rawak* suits, if successful, would not have resulted in a "loss" to *McDonnell.* I conclude that this contention is without merit. *See* pp. 31–34, *supra.*

tainable to THE FIDELITY AND CASU-ALTY COMPANY OF NEW YORK, 80 Maiden Lane, New York 38, New York. If claim is made on account of such violation, or allegation thereof, the Insured shall give like notice of such claim, together with full particulars.

This provision is incorporated by reference into the excess insurance policies under paragraph 2 which provides that this "contract is subject to the same terms, conditions, exclusions and stipulations (except as regards the premium and except as otherwise provided herein) as are contained in the Primary Policy."

Both the primary policy and the excess policy also contain a notice provision relating specifically to loss or liability discovered after the expiration of the policy but within thirty-six months following the date of expiration. This provision stipulates that "such discovery must be promptly reported to the company".

Defendants argue that the notice given with respect to the *Mark* and *Sobel* claims was not prompt. Plaintiff counters that by denying liability on grounds other than untimely notice, defendants have waived their right to assert any failure on the part of the insured to meet the notice requirements in the *Mark* and *Sobel* cases and that, in any case, notice was promptly given.

#### A. *Waiver*

On September 25, 1970, defendants denied coverage under the excess policies. They relied in part on the reasoning set forth by the primary carrier in its letter to the insured of August 10, 1970. The primary insurer had there denied coverage on the grounds that the claims arose out of self financing transactions which were beyond the scope of the policy. While no breach of the notice provisions of the policy was mentioned by the defendants on September 25, 1970, they did state in their letter that it was to be "understood that by our actions herein we are not waiving any other possible rights or defenses." [14]

 Under New York law [15] an insurer may be precluded from asserting a defense to recovery on an insurance policy if it has earlier denied liability on other grounds and failed to mention a deficiency in the notice or proofs. *Brink v. Hanover Fire Insurance Company,* 80 N.Y. 108 (1880); *Devens v. Mechanics & Traders' Insurance Company,* 83 N.Y. 168 (1880); *Rock Transport Properties Corporation v. Hartford Fire Insurance Company,* 433 F.2d 152 (2nd Cir. 1970); *John Alt Furniture Company v. Maryland Casualty Company,* 88 F.2d 36 (8th Cir. 1937). Such a result is reached either because the trier of fact finds that the insurer has intentionally abandoned such claims or because it finds that the insured has relied to its detriment on the insurer's failure to object. *Devens v. Mechanics & Traders Insurance Company, supra.* Under the former set of facts the insurer is considered to have waived its right to assert the claim, while under the latter, the insurer is estopped from asserting the defenses. *John Alt Furniture Company v. Maryland Casualty Company, supra.*

---

**14.** See Exhibit 10 of plaintiff's Appendix to its answering brief in opposition to the defendants' motion for summary judgment and in support of its cross-motion for summary judgment. Defendants also denied liability on grounds that McDonnell had not exhausted the coverage of the primary policy.

**15.** The parties have agreed, and I concur, that New York law applies here. The Court must look to the forum state's conflict laws to ascertain which law to apply in interpreting the insurance contracts. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477

(1941). And it is the law of Delaware, the forum state, that the law of the place where the contract was made controls in determining the construction and the validity of the contract. *See Oliver B. Cannon & Sons, Inc. v. Door-Oliver, Inc.,* 312 A.2d 322 (Super.Ct.Del.1973); *La Chemise Lacoste v. Alligator Company,* 374 F.Supp. 52 (D.Del.1974), *vacated on other grounds,* 506 F.2d 339 (3rd Cir. 1974), *cert. denied* 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975), *rehearing denied* 421 U.S. 1006, 95 S.Ct. 2408, 44 L.Ed.2d 674 (1975). The place of making of the insurance policies at issue here was New York.

While early New York Court of Appeals [16] and lower court opinions [17] could be read to suggest that waiver and estoppel are identical and that the insurer is only precluded from asserting defenses where there has been some detrimental reliance, later Court of Appeals cases make it clear that waiver and estoppel are separate and viable grounds for precluding an insurer from asserting particular defenses. As the Court of Appeals said in the *Devens* case at p. 173:

> The doctrine of waiver . . . should not be extended so as to deprive a party of his defense, merely because he negligently, or incautiously, when a claim is first presented, while denying his liability, omits to disclose the ground of his defense, or states another ground than that upon which he finally relies. There must, in addition, be evidence from which the jury would be justified in finding that with full knowledge of the facts there was an intention to abandon, or not to insist upon the particular defense afterward relied upon, *or* that it was purposely concealed under circumstances calculated to, and which actually did, mislead the other party to his injury. (Emphasis supplied)

I find no basis in the record before me to preclude defendants from relying on the defense of untimely notice on either a theory of waiver of of estoppel. The letter denying coverage explicitly stated that the insured did not intend to waive its other defenses by adopting the defense offered by the primary insurer. In the face of such an expression, I am not justified in implying an intent on the part of defendants to abandon their notice defense. 18 *Couch on Insurance 2d* § 71:45 at 37–38.

The case of *Karelson v. Sun Fire Office of London,* 9 N.Y.St.Rep. 831 (1887) does not alter this conclusion. There, the insured submitted to the insurer proofs of loss which in fact did not meet the terms of the insurance policy. A week later and still within the time when the insured could rectify its error, the insurer wrote to the insured denying liability and indicating that it did not agree to the correctness of any claim contained in the proofs of loss. The denial also contained a general statement that the insured did not waive any defense, expressly reserving any and all objections to claims made by the insured. The court found that despite the general disclaimer, the insurer's retention of proofs without objection and its denial of liability on other grounds misled the insured into believing that the insurer had no objection to the form of the proofs of loss. Because the insured had been misled to its detriment, the court concluded, the insurer was estopped from asserting inadequate proofs of loss as a defense to recovery under the insurance policy. It does not follow from this case, however, that in determining whether the insurer in fact intended to waive certain defenses, the trier of fact may disregard that party's expressed intention not to do so.

Nor do I find on the record before me that the insured relied to its detriment on the insurer's denial of liability on grounds other than untimely notice. Here the insurer denied liability six months after notice had been given. Thus this is not a case where the insured failed to give notice because it was led by the insurer's denial of liability on other grounds to believe that the giving of such notice would be futile. In such cases the law is clear that the insurer would be estopped from asserting inadequate notice as a defense. Nor is this a case like *Brink* where the insurer did not raise the defense of untimely submission of proofs of loss until after it had accepted and retained those proofs without objection, had denied liability on the grounds of fraud in the obtaining of the policy, and had put the insured to considerable burden and expense prosecuting its claim and successfully defending against the charges of fraud. There is nothing in the record here to indicate that McDonnell relied in any way to its

---

16. *Brink v. Hanover Fire Insurance Company,* 70 N.Y. 593 (1877).

17. *Black Starline v. Baltica Insurance Company,* 220 App.Div. 434, 221 N.Y.S. 574 (1927).

detriment on the insurers' failure to raise a lack of prompt notice objection in their initial letter of September, 1970.

### B. *Promptness*

■ I construe the excess policies to require notice to the excess insurers as well as to Fidelity. The question, accordingly, remains whether the insured gave the required notice to the excess insurers. Whether one considers the requirements to be one of "immediate" notice or of "prompt" notice, under New York law, the relevant inquiry is whether notice was given within a reasonable time. *Zauderer v. Continental Casualty Company*, 140 F.2d 211 (2nd Cir. 1944). *See also Security Mutual Insurance v. Acker-Fitzsimmons*, 31 N.Y.2d 436, 293 N.E.2d 76, 340 N.Y.S.2d 902 (1972); *Imparato Stevedoring Corp. v. Lloyd's Underwriters*, 27 A.D.2d 827, 278 N.Y.S.2d 153 (1967); *Greenwich Bank v. Hartford Fire Insurance Company*, 250 N.Y. 116, 164 N.E. 876 (1928).

■ In addressing the question of whether the notice given was reasonable it is appropriate to consider whether the period of delay was such as to frustrate the purpose of the notice clause. Thus, possible or actual prejudice to the insurer from such a delay is an element to be considered, even though a showing of such prejudice is not a necessary element of the defense of untimely notice. *Kason v. City of New York*, 83 Misc.2d 810, 373 N.Y.S.2d 456 (1975); *Security Mutual Insurance v. Acker-Fitzsimmons, supra*. With these principles in mind, I turn to the facts of the *Mark* and *Sobel* cases.

Mark filed his complaint and a motion for a preliminary injunction on December 24, 1969. An evidentiary hearing on that motion was held on January 29, 1970. At the beginning of the hearing, plaintiff filed a motion for summary judgment on Count II, the count upon which judgment was ultimately entered. That count was predicated

on the Illinois Blue Sky Law which makes any sale of any unregistered, nonexempt security "voidable at the election of the purchaser", who may recover from the seller "the full amount paid".[18] McDonnell conceded that there had been no registration but contended that the stock involved was exempt. Mark testified at length; the McDonnell executive with whom he had negotiated was present but did not testify. At the close of the hearing, the court entered a preliminary injunction restraining any transfer of Mark's American Home Products stock.

Following the hearing, affidavits and briefs with respect to plaintiff's motion for summary judgment were filed. The District Court filed an opinion on August 3, 1970 holding that plaintiff was entitled to summary judgment. A final judgment was entered on September 24, 1970.

■ The record before me reveals that McDonnell did not notify the excess carriers of the *Mark* claim until June 22, 1970. This was at an advanced stage of the summary judgment proceedings, six months after the filing of the complaint and five months after the issuance of the preliminary injunction. Under these circumstances I have no hesitancy in holding that McDonnell did not give notice to the excess insurers within a reasonable time.

The record with respect to the *Sobel* claim is not as well developed. All that the record reveals is that McDonnell received notice of the *Sobel* claim by at least March 16, 1970, that it gave notice to the primary carrier on March 18, 1970, and that it gave notice to the excess carriers on June 22, 1970. There are, however, suggestions in the record that McDonnell received notice before March 16, 1970.[19] Defendants maintain that for present purposes the Court should ignore these suggestions and hold that, as a matter of law, a three month unexcused delay bars recovery even in the absence of a showing of prejudice to the

18. Ill.Rev.Stat. Ch. 121½, § 137.1 *et seq.*

19. The complaint in *Sobel* was filed on February 12, 1970. Moreover, that complaint alleges

that Sobel gave notice of his election to rescind prior to the filing of the complaint.

insurer. The matter is not as clear under New York law as defendants suggest, however, and in the exercise of my discretion, I decline to render an opinion on what would appear to be a hypothetical question. Defendants may renew their motion if and when discovery either establishes the actual chronology or reveals that the true facts are beyond recall.

## ABSENCE OF LOSS OR LIABILITY

Defendants contend that McDonnell suffered no "loss or liability" as a result of the settlement agreement reached in the *Sobel* case. Their theory, as I understand it, is that the settlement agreement, in effect, resulted in a rescission in which Sobel surrendered his McDonnell stock and received a claim against the receivership estate in an amount equal to the purchase price of that stock.[20] According to the defendants, such a rescission does not result in a "loss" to a corporation as that term is used in the policies.

Defendants first argue that McDonnell was no worse off as a result of the rescission since Sobel did not merely receive a claim against McDonnell; simultaneously gave up stock which had represented a claim on its assets. Second, defendants contend that McDonnell cannot be said to have sustained a "loss" because it was in no different position after the rescission than it was in before the *original sale*.

I reject both prongs of defendants' argument. To simplify the analysis, we may treat the *Sobel* settlement as a straight cash for stock rescission. The sale of stock did not create a liability on the part of McDonnell to Sobel which was cancelled upon rescission of the transaction in question. Rather it represented an increase in the company's net worth, which was lost to the corporation upon rescission of the transaction. That the assets received by a company from a sale of stock create net worth cannot be questioned.[21] Nor can it be ques-

tioned that when McDonnell was forced to return the money it received from the sale of the Sobel shares, it lost a valuable asset. To say that McDonnell got back shares of treasury stock in return is not an answer. The corporation's treasury stock is not an asset of the corporation.[22] In practical terms, the fact that the corporation has a given number of shares of treasury stock is no different than its having the power at any time to issue an equal number of shares of its authorized but unissued stock. In either case the power to raise assets, through the sale of treasury stock already in existence or through issuing stock and then selling it, cannot itself be considered an asset of the corporation. McDonnell was forced to give up a valuable asset in return for what it always had, the power to go into the market and raise capital.

The second fallacy in defendants' analysis lies in their effort to have the Court ascertain whether McDonnell suffered any loss as the result of its dealings with Sobel. This misconstrues the terms of the policy. The policy covers loss "incurred or sustained by reason of any *claim or claims* which may be made against the Insured under [the securities law]". (Emphasis added). The appropriate comparison is that between the position of McDonnell before a securities act claim was made by Sobel and after the rescission of his stock purchase. The fact of the matter is that a loss is suffered as a result of such a rescission because the corporation winds up with fewer assets to pursue its business objectives without a commensurate reduction in its liabilities.

Defendants' argument that no loss was sustained in the *Sobel* rescission is a reflection of the view expressed in the disclaimer letter of September, 1970 that no coverage of *issuer* liability was intended. It is conceivable to me that, when issuing these policies, defendants did not have the poten-

---

20. I accept this characterization of the settlement agreement for present purposes even though it does not expressly reflect return of the Sobel stock.

21. *See Fiflis & Kripke, Accounting for Business Lawyers*, at pp. 1–3.

22. *Carey, Cases and Materials on Corporations* at 1615; *Fiflis & Kripke* at pp. 387–395.

tial liabilities of an issuer in mind. Given the factual background, they may have focused primarily on *underwriter* liability. The policies as written, however, are not limited to loss or liability arising from an underwriting, and I can perceive no policy reason why a corporation should not be entitled to insure itself against losses arising from rescission of stock sales where no dishonest act occasions the rescission.

Defendants are not entitled to summary judgment on the *Sobel* claim on the ground that McDonnell suffered no loss within the meaning of the policies.

## PURCHASES AND SALES AS BROKER ON COMMISSION FOR ACCOUNTS OF CUSTOMERS

Paragraph 4 of the primary policy, which is included in the excess policies by paragraph 2 thereof, excludes from coverage:

> Any loss, liability, costs or expenses arising out of the purchase or sale of securities as brokers on commission for account of the Insured's customers or arising out of sales to or purchases from other brokers or dealers as brokers on commission for account of the Insured's customers except such purchases and sales as may be made by the Insured as the Representative of a group of Underwriters or dealers during a stabilization period as permitted by the applicable provisions of the statutes administered by the U.S. Securities and Exchange Commission and by its rules and regulations thereunder and except any purchases and sales made by the Insured as brokers under an agreement requiring the Insured to purchase any unsold portion of an issue of securities specified in such agreement.

*Notz's* claim that he was damaged as a result of McDonnell's having churned his account clearly arises "out of the purchase or sale of securities as brokers on commission for account of the Insured's custom-

ers". Any loss or liability incurred by McDonnell as a result of that claim is thus excluded from coverage.[23]

## CONCLUSION

Defendants are entitled to summary judgment with respect to the *Murphy, McDonnell, Beebe, Green, Band, Mark* and *Notz* claims. Plaintiff is entitled to summary judgment against the first excess insurers with respect to the *Cohig* and *Rawak* claims. Disposition of the *Sobel* claim will have to await further development of the record.

Submit order.

---

**23.** The record also discloses that McDonnell received notice of the *Notz* action on April 28, 1971, that it gave notice to Fidelity on November 3, 1971, and that it has never given notice to the excess insurers. The defendants are entitled to summary judgment on this ground as well.