**RESEARCH EQUITY FUND, INC., Appellant,**

v.

**The INSURANCE COMPANY OF NORTH AMERICA, Appellee.**

**No. 77–1467.**

United States Court of Appeals, Ninth Circuit.

May 31, 1979.

Rehearing Denied July 11, 1979.

---

Fred C. Aldridge, Jr., of Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellant.

Nicholas Deriman, of Swaner, Leslie & Deriman, San Francisco, Cal., for appellee.

Before WRIGHT and KILKENNY, Circuit Judges, and PFAELZER,* District Judge.

PFAELZER, District Judge:

This case involves certain fidelity bonds issued to appellant Research Equity Fund, Inc., formerly Winfield Growth Fund ("WGF"), a mutual fund, by appellee Insurance Company of North America ("INA"). Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332. The District Court held that the bonds did not cover the losses suffered by appellant and entered judgment for INA. We affirm.

## I

## FACTS

WGF is a Maryland corporation registered as a management investment company under the Investment Company Act of 1940 ("the Act"), 15 U.S.C. §§ 80a–1, et seq. It is subject to the requirements of the Act and to the rules thereunder. On June 15, 1969, the effective date of the bonds in question, Rule 17g–1, promulgated pursuant to Section 17(g) of the Act, required that registered management investment companies maintain a fidelity bond against:

> larceny and embezzlement, covering each officer and employee of the investment company, who may singly, or jointly with others, have access to securities or funds of the investment company, either directly or through authority to draw upon such funds or to direct generally the disposition of such securities . . ..

Winfield & Co. was employed under a management contract with WGF to act as its investment advisor. Winfield & Co. purchased the bonds from INA on behalf of various corporate entities known as the Winfield Complex, of which WGF was a part.

* Of the Central District of California.

A. Stephen Sanders was an employee of Winfield & Co. assigned to manage various portfolios, including that of WGF. It was his responsibility to arrive at decisions with respect to the securities to be purchased or sold for WGF's portfolio. Sanders' recommendations as to the securities to be purchased or sold were subject to the approval of his superior at Winfield & Co., who was an officer of both Winfield & Co. and of WGF. Orders for the securities transactions were placed with the "trader" who was an employee of Winfield & Co. responsible for the execution of the orders through stockbrokers. Upon examination of confirmations received from executing brokers, authorized officers of WGF would then direct WGF's custodian bank to pay for and accept delivery of securities purchased or to receive payment for and deliver securities sold.

During the period from December, 1969, through March, 1970, Sanders received bribes from persons who were not employees of WGF or Winfield & Co. for recommending the purchase of certain securities at prices Sanders knew to be manipulated.[1] As a result of Sanders' recommendations, WGF purchased several securities at artificially inflated prices, and suffered losses in selling them when the scheme was discovered. It is for these losses which WGF seeks to recover from INA.

The District Court held for INA, concluding that Sanders' conduct was not covered by the bonds. Appellant raises several contentions in this regard, and we deal with each in turn.

## II

## PERSONS COVERED BY THE BONDS

■ Appellant contends that Sanders was an employee of WGF and that WGF is therefore covered under the bonds for losses resulting from Sanders' activities. The trial court made detailed findings with respect to Sanders' status as an employee and concluded:

Considering all the circumstances of this case, including the definition of "employee" in the bonds, the Fund's representations to the S.E.C., and the Fund's representations to INA, A. Stephen Sanders was not an officer or employee of [WGF] for the purposes of coverage under the Winfield Bonds. Conclusion of Law No. 5.

The evidence clearly supports the finding that Sanders was an employee of Winfield & Co., not of WGF. He was hired and paid by Winfield & Co. He was listed as an employee of Winfield & Co. on the application made to INA for the bonds and in the annual reports of Winfield & Co. to the Securities & Exchange Commission ("S.E. C."). Further, in the proof of loss filed with INA, appellant stated under oath that Sanders was an employee of Winfield & Co.

Despite the fact that Sanders was not an employee of WGF, our reading of the language of the bonds leads us to conclude that he was, nevertheless, among the persons for whose acts WGF was covered. The bonds provided that INA would "indemnify and hold harmless the Insured" from "[l]oss through any dishonest or fraudulent act of any of the Employees . . .." Paragraph 1 of the Declarations page of the bonds defined all of the companies listed jointly as the "Named Insured." The companies listed included WGF and Winfield & Co. The bonds defined the word "employee" as follows:

Wherever used in this bond, Employee and Employees shall be deemed to mean, respectively, one or more of the Insured's officers, clerks and other employees employed by the Insured during the currency of this bond . . ..

Attached to the bond application was a list of the "employees" to be covered. Twenty-six persons were listed under the heading Winfield & Co., Inc., and three were listed

---

**1.** An indictment was returned in the United States District Court for the Southern District of New York against Sanders and others who had participated in this and similar conspiracies. Sanders ultimately plead guilty to counts 21 and 29 of the indictment. *United States v. Hagopian, et al.*, 72 Cr. 994, S.D.N.Y. (1972).

under Winfield Distributors, Inc., the entities who respectively paid their salaries. WGF had no employees of its own, and, although it had officers, there were no persons separately listed for WGF. Thus, if WGF was to have any coverage at all, it must have been intended that it be covered for acts of those who were employees of the other companies. Certainly the phrase "any of the employees" of the insured encompassed Sanders. Both Winfield & Co. and WGF were included in the definition of named insured; consequently, INA cannot avoid liability on the basis that Sanders was not an employee of WGF.

## III

### THE TRADING LOSS EXCLUSION

■ The bonds issued to WGF and the other joint insureds contained the following provision:

Section 1. This bond does not cover:

.        .        .        .        .

(e)(1) Any loss resulting directly or indirectly from trading, including all transactions involving the purchase, sale or exchange of securities, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance.

This provision, commonly known as the trading loss exclusion, was held by the District Court to bar WGF's recovery against INA. However, WGF contends, as it did below, that the trading loss exclusion is not applicable to the losses occasioned by Sanders' activities. In support of this contention, WGF argues that the term "trading" as used in the quoted provision is ambiguous. More specifically, WGF argues that

this type of bond was developed for stockbrokers and that the trading loss exclusion was intended to apply only to the kinds of risks normally encountered by stockbrokers. Since it is not a stockbroker, WGF argues that the exclusion should be held inapplicable to it.

WGF's argument is, however, foreclosed by the careful and detailed findings of the District Court. The District Court found that the term "trading" is well understood in the industry,[2] and particularly by WGF and INA. The term trading was frequently used by WGF to describe its activities, as evidenced by, *inter alia*, its minutes and internal memoranda. The District Court also found that there is no common understanding in the insurance brokerage industry that the trading loss exclusion applies only to stockbrokers. In fact, INA offered to waive this exclusion for WGF in consideration for an additional premium, but this coverage was declined.[3] The District Court found that other mutual funds did in fact purchase this coverage. After examining the record carefully, we have concluded that the findings of the District Court are fully supported by the evidence. We are thus bound by the findings below and we hold the trading loss exclusion applicable to WGF.

## IV

### MISREPRESENTATION

■ WGF argues that it was misled by INA's agent into believing that it was covered by the bonds for any losses resulting from the activities of the portfolio managers. However, the District Court found that WGF relied primarily on the opinion of its legal counsel in deciding on its coverage, and was not misled by INA. These findings are not clearly erroneous, and are binding on us on appeal.

2. It is significant to note that in the Act, Congress recognized that mutual funds trade, stating that "the principal activities of such companies [are] investing, reinvesting, and trading in securities." 15 U.S.C. § 80a–1(a)(2).

3. The trial court found that the additional premium for trading loss coverage was 35% to 50% over the basic cost.

## V
## STATUTORY BOND

WGF argues that even if the trading loss exclusion precludes recovery for Sanders' activities, the bonds should be read to provide such coverage because they were issued as statutory bonds. The general rule is as follows:

A statutory bond will be reviewed in the light of the statute creating the duty to give security. It will be generally held that the provisions of the statute and regulations will be read into the bond. [Citations omitted] So also, if a statutory bond contains provisions which do not comply with the requirements of law, they may be eliminated as surplusage and denied legal effect. *American Casualty Co. v. Irvin,* 426 F.2d 647, 650 (5th Cir. 1970).

■ In order to prevail on the statutory bond theory, WGF must first establish that the type of loss WGF suffered is encompassed by the terms "larceny" and "embezzlement" as they are used in Rule 17g–1, quoted above. INA argues that these terms, in their accepted interpretations, do not cover the acts attributed to Sanders. However, it is our opinion that when an employee knowingly pays more for an item than it is worth with the intention of enriching the person from whom the purchase is made, this is theft as surely as if the employee had given the other person the money directly. Disguising the theft as a purchase does not make it any less a theft. *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158 (2d Cir. 1978); *See generally Brown v. Bullock,* 294 F.2d 415, 419–420 (2d Cir. 1961).

Arguably then, the trading loss exclusion here could, under the statute, be interpreted so as not to exclude losses occasioned by Sanders' activities. However, interpretation of a bond to provide coverage beyond its literal terms is permissible only to the extent that such coverage is required by the statute. Rule 17g–1 requires that management investment companies obtain coverage against larceny or embezzlement committed by its officers and employees. Thus, in order to limit the scope of the trading loss exclusion and thereby imply coverage beyond the express terms of the bonds, appellant must not only show that Sanders' activities constituted larceny or embezzlement, but also that Sanders was an officer or employee of the management company, WGF.

■ With regard to this second requirement, we have concluded above that although Sanders was covered under the bonds, he was not in fact an employee of WGF. This would seem to preclude the application of the statutory bond analysis in this case.[4] WGF argues, however, that the term "officer and employee of the [management] investment company" in Rule 17g–1 should include individuals such as Sanders. WGF points out that it had no employees of its own, and that the Winfield & Co. employees functioned as if they were WGF employees. Furthermore, a close relationship existed between the two companies; all of the WGF officers were also officers of Winfield & Co. Thus, although Sanders was not an employee of WGF, he was serving in a position functionally equivalent to that of an officer or employee.

However, as WGF concedes, this type of special relationship between investment advisers and mutual funds is the norm in the industry. There is evidence that Congress and the S.E.C. were aware of this practice when Section 17(g) was passed and the rules pursuant thereto promulgated.[5] It is

---

**4.** This is wholly consistent with the analysis in *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158 (2d Cir. 1978), wherein it was conceded that the person who participated in the scheme to defraud the mutual fund was an employee of that fund.

**5.** The Act defines "Investment Adviser" of an investment company as:

(A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall

significant then that coverage was required for officers and employees of mutual funds, but not for persons such as Sanders acting in capacities functionally equivalent to that of officer or employee of a mutual fund.

Furthermore, separate legislation was enacted simultaneously with the Investment Company Act of 1940 governing the conduct of investment advisers. *See* Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1, *et seq.* This legislation contained no requirement that investment advisers be bonded. In 1975, Congress considered amending the Investment Advisers Act to authorize the S.E.C. to require bonding of investment advisers. In rejecting such legislation, Congress obviously contemplated that the bonding requirement would be applicable only to those persons who are in fact officers or employees of the mutual fund.[6] Persons such as Sanders who are investment advisers, even though "empowered to determine what securities or other property shall be purchased or sold" by the mutual fund, 15 U.S.C. § 80a–2(a)(20), were not required to be bonded.

Since the statute does not require coverage for the losses suffered by WGF at the hands of someone such as Sanders, the trading loss exclusion in the bonds must be given full legal effect in the present case. We thus affirm the judgment of the District Court.

AFFIRMED.

be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A) . . . .
15 U.S.C. § 80a–2(a)(20)

In 1966, the "Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth," H.R. Rep.No.2337, 89th Cong., 2d Sess. (1966), was submitted to Congress. Page 87 thereof states:

Like typical business enterprises elsewhere in the economy, some investment companies, especially closed and companies, are internally managed by officers and staffs employed directly by the companies. As noted in Chapter II, however, the management function of most mutual funds is contracted out to an external investment advisory organization, the principals of which are the persons who organized and promoted the fund from its inception or the successors of such persons. In such instances, the analysts and other professional personnel on whose expertise the fund relies are employees of the advisor, not of the fund . . . .

6. In its statement to Congress in support of the proposed amendments, the SEC stated that:

[a]t the present time there are no specific requirements imposed by the Act on investment advisers in order to assure that they have the financial strength necessary to carry out their functions in a manner consistent with their obligations to clients, nor are they subject to bonding requirements to prevent losses to clients which might result from embezzlement, misappropriation, breach of duty, or insolvency. [1973–1976 Transfer Binder] Mutual Funds Guide (CCH) ¶ 10,244 at 13,384.