SHEARSON/AMERICAN EXPRESS, INC., Plaintiff,

v.

FIRST CONTINENTAL BANK AND TRUST COMPANY, et al., Defendants.

and

FIRST CONTINENTAL BANK AND TRUST COMPANY, Third-Party Plaintiff,

v.

KANSAS BANKERS SURETY COMPANY and Fidelity and Deposit Company of Maryland, Third-Party Defendants.

No. 81–1059–CV–W–3.

United States District Court, W.D. Missouri, W.D.

Jan. 19, 1984.

Arthur L. Smith, Michael David Hart, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., Floyd R. Finch, Jr., Black-well, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for plaintiff.

Jerome D. Riffel, Campbell, Gilmore, Erickson, Cottingham, Morgan & Gibson, Kansas City, Mo., for defendant First Continental Bank and Trust Co.

Robert Thomson, Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, Mo., for defendant William G. Evans.

Jack G. Beamer, Kansas City, Mo., for third-party defendant Fidelity and Deposit Co. of Md.

Thomas L. Theis, Alan V. Johnson, Topeka, Kan., for third-party defendant Kansas Bankers Surety Co.

### MEMORANDUM AND ORDER

ELMO B. HUNTER, Senior District Judge.

Before the Court is the joint motion of the Third-Party Defendants, Kansas Bankers Surety Company (KBS), and Fidelity and Deposit Company of Maryland (FDC), for judgment on the pleadings. Through the course of responses filed by the parties, the motion has evolved into one for summary judgment. It will be treated as such by this Court.

Prior to proceeding to the merits, a short relating of the posture of the case might prove helpful. In 1981, Shearson/American Express, Inc. (Shearson) sued William C. Evans (Evans), and First Continental Bank and Trust Company (First Continental), to recover losses it had sustained. Evans, while employed as a vice president by First Continental, had had Shearson open an account for the transaction of securities.

As with any lawsuit on the verge of trial, each participant views the circumstances differently. Shearson states that it believed Evans opened the account on the behalf of First Continental, and it acted only on that belief. First Continental, however, claims that it had no knowledge of Evans' transactions on the account until approached by Shearson to make up the deficit. Evans states that he used forged guarantee papers to make it appear that First Continental's assets stood behind the

transactions, but that he and the broker he dealt with knew that First Continental was not involved nor guaranteeing the transactions. When Evans could not cover the losses incurred in the transactions, Shearson approached First Continental for payment. When First Continental refused, this action was initiated.

KBS and FDC are sureties. Each issued a surety bond known as a Banker's Blanket Bond to First Continental. First Continental maintains that the surety bonds insure against any liability to Shearson created by Evans' dishonest dealings with Shearson. When the two sureties refused to defend the action and to indemnify First Continental against the claim of Shearson, First Continental filed a third party claim against them. The sureties have moved for judgment on the pleadings based on their position that any loss caused by Evans trading in securities with Shearson is not covered by the bonds.

## BOND COVERAGE

Each surety individually issued a surety bond to First Continental. The two bonds are practically identical; both are Standard Form 24. This is the insurance form that is used throughout the banking industry.

Standard Form 24 begins with several insuring agreements stating the coverage of the bond and ends with definitions and exclusions. Only Insuring Agreement (A) and the trading loss exclusion are pertinent to this Court's resolution of the motion.

First Continental relies on Insuring Agreement (A) as the basis for its position that it is insured against any liability created by the acts of Evans. Agreement (A0, in part, provides that the surety will indemnify First Continental for "loss resulting directly from dishonest or fraudulent acts of an Employee ...."[1] Both sides appear to agree that the acts of Evans were dishonest or fraudulent and would come within this provision. The two sureties also seem to agree that taken alone, without regard for any exclusions Agreement (A) would shelter First Continental from any loss created by Evans' dealings with Shearson.

KBS and FDC, however, contend that the "trading" exclusion denies First Continental coverage. In each bond is a provision which excludes from the coverage of the bond "loss resulting directly or indirectly from trading, with or without the knowledge of the Insured ...."[2] The two sure-

1. The bond issued by KBS is the 1980 edition of Standard Form 24. Insuring Agreement (A) contained in that bond provides for the following coverage.

The Underwriter ... agrees to indemnify the Insured for:
#### FIDELITY
(A) Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others.

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent
(a) to cause the Insured to sustain such loss, and
(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.
The bond issued by FDC is the 1969 edition of Standard Form 24. The following has been substituted by a rider for the initial Insuring Agreement (A).
(A) Loss resulting directly from one or more dishonest or fraudulent acts of an Em-

ployee, committed anywhere and whether committed alone or in collusion with others, including loss of Property resulting from such acts of an Employee, which property is held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent
(a) to cause the Insured to sustain such loss; and
(b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

2. The "trading" exclusion in the KBS bond is as follows:
Section 2. This bond does not cover ...
(i) loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any

ties maintain that any liability owed Shearson by First Continental or any other loss suffered due to the acts of Evans were the result of Evans having purchased and sold securities through Shearson. First Continental, of course, raises a number of objections to the application of this exclusion to the present circumstances. The Court will take up each as pertinent.

The crux of the question is the proper construction of the "trading" exclusion as applied to Insuring Agreement (A). Both parties agree that Kansas law is applicable to the question and have provided the Court with numerous Kansas cases.

■ Under Kansas law a surety bond is treated as a contract for insurance. The bond is subject to the same rules of construction that apply to insurance contracts. *Docking v. National Security Co.*, 122 Kan. 235, 240, 252 P. 201 (1927). The construction and effect of an insurance contract is a question of law for the Court's decision. If the facts are uncontested, then the Court is to decide whether they fall within the policy. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 177, 660 P.2d 1374 (1983); *Mah v. United States Fire Ins. Co.*, 218 Kan. 583, 586, 545 P.2d 366 (1976). "In construing an insurance policy, a Court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished." *Farm Bureau*, supra.

First Continental argues that the word "trading" is ambiguous when used in an insurance policy for banks. It points out that the policy fails to define "trading." First Continental asserts that this failure is intentional in order not to narrow the exclusion. In support, the Bank cites the Court to a publication of the American Bankers Association, the *Digest of Bank Insurance*, 1.3.33, p. 7 of the supplement (4th ed. 1983). First Continental concludes by maintaining that the duty is on the surety to make an exclusion clear. Any resulting ambiguity should be resolved in favor of the insured.

■ Kansas law contains an established approach to ferreting out and resolving any ambiguities existing in an insurance contract. The law is clear that when contracts of insurance are in question the burden does fall on the surety to make sure that the terms of the policy, when studied as a whole, are clear. This rule has particular application to exclusions. *Mah v. United States Fire Ins. Co.*, 218 Kan. at 286, 545 P.2d 366; *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 417, 449 P.2d 477 (1969). If the exclusion in question is unclear or ambiguous, then in the typical case "the policy will be liberally construed in favor of the insured." *Id.* If, on the other hand, the exclusion proves to be unambiguous, then the Court's role is limited to applying the word's plain meaning and enforcing the contract. *Id.*

■ The threshold question is whether the term "trading" is ambiguous. A term, provision, or contract is ambiguous if the natural and reasonable reading of its language allows for two or more possible meanings. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. at 180, 660 P.2d 1374;

indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (D) or (E).
The following is the "trading" exclusion contained in the bond issued by FDC.
It is agreed that:
1. The Underwriter shall not be liable under the attached bond for any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of the Employee in connection with any account relating to such trading, indebtedness or balance.
In regard to Blanket Bonds Nos. 5, 22 and 24, this sub-section shall not apply to Insuring Agreement (D) and (E) if coverage is carried thereunder.

**1310**

*Casey v. Aetna Casualty & Surety Co.*, 205 Kan. 495, 499, 470 P.2d 821 (1970); *Clark v. Prudential Ins.*, 204 Kan. 487, 491, 464 P.2d 253 (1970). All parties recognize that the test to be applied is "what a reasonable person in the position of the insured would have understood [the words of the policy] to mean." *Id.*

■ First Continental maintains that the meaning of "trading" varies by its contractual use, and cites the Court to various definitions of "trading." It implies that the various definitions indicate ambiguity. The Court disagrees. The fact that trading is defined differently in different contexts does not indicate ambiguity. The term is ambiguous only if a reasonable person in the banking industry would understand it to have more than one meaning in that context.

The bank argues that "trading" in the banking industry context means the lending and borrowing of money. It could not have contemplated that the unauthorized and illegal acts of Evans in trading securities would fall within the "trading" exclusion.

■ The simple answer is that the subjective understanding of a particular insured is not controlling when it does not coincide with the objective understanding of his brethren similarly situated. That appears to be the case here. First, both parties agree that the "trading" exclusion was adopted from the insurance contracts issued stockbrokers. See *Digest of Bank Insurance*, 35 (3d ed. 1977). The cases reviewing the "trading" exclusion, in the stockbroker context, have found it unambiguous. *Research Equity Fund v. Ins. Co. of N. America*, 602 F.2d 200, 201 (9th Cir.1979). See *Sutro Bros. & Co. v. Indemnity Ins. Co. of N. America*, 386 F.2d 798, 801 (2nd Cir.1967); *Roth v. Maryland Casualty Co.*, 209 F.2d 371, 374 (3rd Cir. 1954); *Stargatt v. Avenell*, 434 F.Supp. 234 (D.Del.1977). Although normally the understanding of an insurance term in one context would not be of much help in defining the term in another, here some weight should be given to the findings in the stockbroker cases because the exclusion here was adopted from the stockbroker blanket bond. Furthermore, the banking community was aware of the source of the exclusion, as evidenced by the *Digest & Bank Insurance*. Second, the historical context of the development of the "trading" exclusion indicates that the exclusion was meant to deal with the buying and selling of securities. The "trading" exclusion was first added to the Bankers Blanket Bond in 1976. It was added in response to the increased trading activity of banks and the resultant increase in losses suffered by banks. Again, the *Digest of Bank Insurance*, 35 (3rd ed. 1977) summed up the rationale for the exclusion to the banking community.

In the early 1970's there was an increase in the volume and types of trading activities engaged in by banks and the number of banks engaged in trading increased. These increases in activity were accompanied by a sizeable increase in employee dishonesty trading losses and some were among the largest bank losses on record.

In 1976 the Surety Association increased Form 24 bond premiums by about twenty percent. In making this increase the Surety Association decided to establish a separate charge for coverage on employee dishonesty trading losses. This follows the precedent in stockbrokers' blanket bonds, and involves a complete exclusion of all trading loss unless forgery is involved and a provision to buy back coverage for employee dishonesty trading losses in full or limited amount. In this way the additional premiums for this coverage are paid by those purchasing it and the cost is not averaged out over all banks regardless of their exposure to trading loss. The 1976 trading loss exclusion parallels the stockbroker wording.

Third, the banking community has discussed the "trading" exclusion. The passage just quoted and the one that follows establishes that bankers were aware that "trading" included the purchase and sale of securities. The following passage discusses the buy-back option for coverage of trading losses.

The purpose of the buy-back procedure is to place the cost of the additional premium on banks that purchase this coverage, rather than including charges for these losses in the basic premiums for all banks. This principle is equitable if a bank is able to estimate its degree of exposure to employee trading losses; but a sound estimate is very difficult, for the following reasons:

If a bank does not engage in buying and selling foreign exchange, bonds, Treasury bills, Ginnie Mae certificates, etc., it might feel it has no need to purchase coverage for employee dishonesty trading loss. However, trading is not defined in the bond, and insurers have been reluctant to interpret in writing how they will apply the exclusion, maintaining that a definition will narrow it. In discussions, insurers have indicated that trading includes buying and selling securities for investment, for trust department operations, for customer accommodations, etc. A bank must also consider the fact that trading losses have involved dishonest employees who engaged in trading operations in the bank's name without its knowledge in areas entirely foreign to the bank's normal operations.

In view of the difficulty of analyzing employee trading loss exposure, many banks purchase the buy-back even though the known exposure may be nominal. When a bank in that position requests a quotation for the buy-back, it should ask its insurance representative to request the insurer to take the limited exposures into account in its pricing.

*Digest of Bank Insurance*, 1.3.33 (4th Ed.1981). The Digest's purpose is to aid bankers identify, analyze, and minimize their exposure to loss through the appropriate insurance coverage. *Id.* at XVI, XVII (4th Ed.1981).

■ From the foregoing, it is clear that the purpose of the trading exclusion was to deal with the insurance problem caused by losses resulting from the buying and selling of securities. The historical context, the adoption of the clause from stockbroker's bonds, and the discussions in the American Bankers Association publication all lead to the conclusion that a reasonable banker would understand the "trading" exclusion to bar recovery for a loss resulting from the purchase or sale of securities. The meaning put forward by First Continental is without basis in light of the foregoing. Besides, if this Court adopted its definition of "trading" as the borrowing and lending of money, then the exclusion would have swallowed the contract. Such an outcome would not have been intended.

■ In reaching the conclusion that the plain meaning of "trading" in this context is the buying or selling of securities, the Court does not have to apply the doctrine of liberal construction in favor of the insured for two reasons. First, as noted above the doctrine only comes into play when an ambiguity is found. See also *Scott v. Keever*, 212 Kan. 719, 725, 512 P.2d 346 (1973). Second, even if an ambiguity had existed, the doctrine would not have applied. The doctrine is applied, generally, to protect a party with bargaining power significantly less than the party with whom it is dealing. Here, Standard Form 24 was the result of the combined efforts of the Surety Association of America and the American Bankers Association. The latter reviewed drafts, recommended changes, and consulted with the drafters. The crucial fact of unequal bargaining power is not present. See *Mark Plaza State Bank v. Kansas Bankers Surety Co., et al.*, No. 103436 (Kan.Cir.Ct. May 17, 1983) (unpublished); *First Nat'l Bank in Wichita v. St. Paul Fire and Marine Ins. Co.*, No. W–3093 (D.Kan., Sept. 29, 1965) (unpublished).

First Continental next contends that "trading" may refer to the buying and selling of securities, but only to losses resulting from trading that is legal under Kansas law. Kansas law prohibits banks from using their own assets to purchase speculative securities. See § 9–1112, Kan. Std.Ann. Kansas law also requires banks to purchase surety bonds to cover losses resulting from the dishonest acts of its employees. Kan.Std.Ann. § 9–1115. First

Continental argues that it could not have understood the "trading" exclusion to cover losses from transactions illegal under Kansas law because that would be contrary to the policy requiring a bond to indemnify for the dishonest act of employees.

■ As KSB and FDC point out, the bonds issued to First Continental comply with Kansas law. Section 9–1115 requires that all officers and employees that deal with the funds of the bank are to secure a good and sufficient bond from a surety company authorized to do business in Kansas. The amount and form are to be approved by the bank's board of directors and the commissioner of banking. The latter is also to hold the bonds. An affidavit from Barbara R. DeHausen, Fiscal Manager, Banking Department of the State of Kansas, states that the two bonds here in question have been approved by and are being held by the Banking Commissioner. The "trading" exclusion does not conflict with the bond requirements of the state, and, therefore requires no pruning by this Court. See *Research Equity Fund, Inc., v. Ins. Co. of N.Am.*, 602 F.2d, 204. Furthermore, the passages from the *Digest of Bank Insurance*, previously cited, make clear that the exclusion was adopted to respond to the losses occasioned by the buying and selling of securities. The exclusion was designed to cover losses from illegal as well as legal trading. As the *Digest* stated, the exclusion extended to "trading losses (caused by) dishonest employees who engaged in trading operations in the bank's name without its knowledge in areas entirely foreign to the bank's normal operations." If First Continental wanted to protect against the dishonest trading of its employees, a buy-back option was available to it. For reasons unknown at this point it failed to purchase the optional coverage.

---

**3.** Rule 14(a) allows a defendant to bring in a third party who is or may be liable to the defendant for all or part of any liability to the plaintiff. Rule 14(a) does not apply here. Shearson is not suing First Continental in re-

## TRUST ACCOUNT

First Continental argues that the bonds do cover Evans' fraudulent removal of funds from a trust account and embezzlement of certain bank funds. First Continental informs the Court that Evans pled guilty to misapplication of funds, a misdemeanor in Kansas. The misdemeanor involved Evans selling a Treasury Note owned by a Trust Account of First Continental, crediting the proceeds to his account, and then purchasing a Treasury Bill to cover. The transaction, however, resulted in approximately an $8,000.00 loss to the trust account.

KBS and FDC respond that the sale and purchase constituted trading within the "trading" exclusion. They also assert that the Court lacks jurisdiction to hear the claim.

Rule 18(a) of the Fed.R.Civ.P. allows a party to assert any third party claims.[3] This is provided, of course, that jurisdiction to hear those claims exists. First Continental's claim that the bonds cover the loss resulting from Evans' purchase and sale is not a federal question, and diversity is lacking. KBS and First Continental are Kansas citizens. The question, therefore, is whether the doctrine of ancillary jurisdiction extends to this claim.

■ The doctrine is premised on the principle that a Federal Court has jurisdiction over an entire case. *Eagerton v. Valuations, Inc.*, 698 F.2d 1115, 1118 (11th Cir.1983); *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir.1982). It provides a federal court with the power to decide matters that arise from, are incidental to, or are dependent on the events or transaction that underlie the main claim for which subject matter jurisdiction does exist. *Schluthess v. United States*, 694 F.2d 175, 178 (9th Cir.1982); *Jenkins v. Weinshienk*, 670 F.2d at 918. The last time this Circuit took up the question it found that ancillary jurisdic-

gard to these actions by Evans. There may be a potential plaintiff out there somewhere, but at present this is a matter solely between First Continental and its insurors.

tion exists over a claim that "arises out of the core of 'operative facts' giving rise" to the main claim. *Kroger v. Owen Equipment & Erection Co.*, 558 F.2d 417, 424 (8th Cir.1977), rev'd, *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).[4]

 The claim that First Continental now puts forward is not within these pronouncements of ancillary jurisdiction. The main underlying matter concerns the purchase and sale of securities by Shearson at the direction of and on behalf of an account set up by Evans, and supposedly for the benefit of First Continental. Evans' sale of a Treasury Note and purchase of a Treasury Bill have not been linked in any manner to the underlying action. It is a separate and distinct set of facts. This Court's disinclination to hear this claim does not prejudice either First Continental or the sureties. The sureties' rights will not be impinged by a decision here and if First Continental wants to pursue this matter the state courts of Kansas are open to it. Besides, if this Court did have ancillary jurisdiction it would be inclined to agree with the sureties and find this claim also barred by the "trading" exclusion.

## EMBEZZLEMENT

First Continental also argues that the blanket bonds cover its losses caused by Evans' embezzlement of certain funds. The bank's allegations indicate that the Trust Department of First Continental had various trust accounts. One special account, a checking account known as the suspense account was used by First Continental to make legitimate bond purchases through Shearson. The bank maintains that Evans removed money from this account for his own use and that the removal

constituted a dishonest act covered by Insuring Agreement (A).

The sureties, again, respond initially that recovery for the claimed loss is barred by the "trading" exclusion. First Continental asserts, however, that Evans' removal of the money was "conversion of Bank assets totally removed from any alleged 'trading,'" and that Evans' dishonest acts were "completely unrelated to any claimed 'bank' trading activities." It maintains that Shearson's loss is due to trading and that its loss is due to Evans' removal of the money from the account.

The sureties' second response is that if the dishonest acts of Shearson, presently alleged, are totally and completely unrelated to the trading activities of Evans through Shearson then the Court lacks ancillary jurisdiction to determine the claim. Here, First Continental maintains that the embezzlement claim "arose during 'the course of the main matter.' It concerns the same operative facts as will be considered in determining the main claim."

 The Court agrees with the latter position of First Continental. The embezzlement claim is interwoven with the main claim; it is part of the same core of operative facts. The Court, however, disagrees with First Continental's view that the facts of the embezzlement claim are totally unrelated to Evans trading. To the contrary, the allegations indicate that the alleged loss to First Continental resulted at least indirectly from trading. The money taken by Evans was in the account in the first instance due to Evans' trading and was used in relation to this trading.[5]

 The sureties provide the Court with an independent reason for denying coverage of the claim. They have produc-

4. The Supreme Court noted in a footnote to its opinion that the Eighth Circuit "believed that the common nucleus of operative fact test also determined the outer boundaries of constitutionally permissible federal jurisdiction when that jurisdiction is based on diversity of citizenship." The Court assumed without deciding that the Circuit was correct. *Owens Equipment & Erection Co. v. Kroger*, 437 U.S. at 371, 98 S.Ct. at 2401.

5. If the Court has misread the allegations here, and the money was not in the suspense account because of Evans' trading or used in connection with his trading then the Court believes that ancillary jurisdiction would not extend to this claim. The claim would be unrelated to the underlying matter, unaffected by the outcome, and available for resolution in another forum.

ed for the Court a portion of the deposition of Mr. A.C. Cooke, an officer and director of First Continental. In this portion of the deposition Mr. Cooke states that the special account was not the bank's account, that the bank did not accept responsibility for Evans' transactions through the separate account, and that the bank did not seek the benefits from those transactions. First Continental has not challenged the accuracy of this testimony. Since First Continental does not claim an interest in the funds in the special account, then it can not claim that it suffered a loss when Evans removed the funds for his own use. A loss is required for coverage under the blanket bonds. This testimony contradicts any claim of loss in this regard.

## DUTIES TO DEFEND

Finally, First Continental argues that the sureties have a duty to defend it and to pay it the reasonable attorney's fees incurred in defending this suit. The bonds contain identical clauses with respect to "court costs and attorney's fees."

D. The underwriter will indemnify the Insured against court costs and reasonable attorney's fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this Bond.

The bank maintains that under the bonds and in Kansas the sureties are to cover these expenses even if only the possibility of coverage exists.

 The Court has not been presented with any information that tends to indicate that the bond covers Shearson's claims against First Continental. The sureties, therefore, have no duty to indemnify First Continental for its expenses of defense. Furthermore, the Court notes in passing that the "Court Costs and Attorney's Fees" clause only creates the duty to indemnify. The clause does not create a duty to defend.

The Court has reviewed at some length the arguments for retaining the sureties in this action, but can not find a basis for doing so. First Continental maintains that summary judgment is improper because issues concerning material facts remain unresolved. That is true with regard to where the loss should fall, as between Shearson, Evans, and First Continental. There have been no disputed facts presented to the Court, either in the pleadings, briefs, or at the evidentiary hearing held on this matter, however, pertaining to the coverage of the bonds. The parties disagree on the meaning and scope of the "trading" exclusion, but that is a question of law. This Court decides that question in favor of the sureties, and consistent with the views expressed above the Court grants KBS and FDC summary judgment.

IT IS SO ORDERED.