ROTH    v.    MARYLAND CAS. CO.
No. 11152.

United States Court of Appeals,
Third Circuit.

Argued Dec. 15, 1953.

Decided Jan. 7, 1954.

C. Brewster Rhoads, Philadelphia, Pa. (Sidney L. Wickenhaver, Francis J. Mc--

Carthy, Philadelphia, Pa., on the brief), for appellant.

Herbert A. Barton, Philadelphia, Pa. (Richard A. Smith, Swartz, Campbell & Henry, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is an appeal from a judgment of the district court sitting without a jury wherein Roth, the appellant, was allowed a partial recovery of his claims against Maryland Casualty Company, the appellee.[1] The basis of jurisdiction is diversity of citizenship.

Roth, trading as Roth & Company, a securities broker in Allentown, Pennsylvania, during all times here material was insured by appellee under an indemnity bond of a type known as a broker's blanket bond. From 1942 until November, 1947, Roth had in his employ as office manager one Harry L. Fletcher. The latter received as compensation a weekly salary plus a 20% commission on net profits in Roth's "mark-up account."[2] This account was maintained to buy and sell various securities for Roth's customers. As each transaction was consummated it was marked up from one-eighth to one-quarter point per share, representing the house's charge for the service rendered. For convenience and to save transfer taxes these securities were cleared through and kept in the Trust Company of North America, Roth's correspondent bank in New York. The bank debited or credited the mark-up account, as the case might be, whenever securities were bought or sold. Fletcher's function was to see to it that customers' orders were executed. It was of course to his benefit to have the mark-up account show as large a net profit as possible.[3] Fletcher appears to have been paid his 20% commissions at the end of the year, at which time the net profits, as reduced by certain charges against gross profits, were computed.

While the record is not quite clear how this occurred without Roth's knowledge, it seems to be undisputed that from 1942 to November, 1947, Fletcher used the mark-up account to buy and sell securities for profit, which profit, however, was not realized by him directly except as it increased his commissions.[4] Until 1946 Fletcher's unauthorized transactions were profitable; in that year and until November, 1947, they showed a total claimed loss of $11,918.13.[5] This loss, as well as several other unrelated losses which were held by the district court to be within the coverage of the indemnity bond or were admitted to be by appellee and concerning which there is no appeal, was discovered upon an audit of Roth's books on November 10, 1947.

The sole issue on appeal is whether the losses sustained by Roth as a result of Fletcher's 1946 and 1947 transactions in the mark-up account are covered by

1. D.C.E.D.Pa.1953, 113 F.Supp. 770.

2. The remaining 80% net profit belonged to Roth.

3. At the trial Fletcher referred to the account in question as the "trading account" while Roth called it the "mark-up account." Roth also testified that his own transactions were conducted through the trading account with which Fletcher had nothing to do and that the mark-up account was used solely for customer transactions.

4. Roth's lack of knowledge of the unauthorized transactions consummated by Fletcher from 1942 through 1947 is re-markable in view of the fact that the New York bank sent monthly statements to Roth concerning all trading done in the mark-up account and, further, because Roth himself realized 80% of all the profits gained for the account by Fletcher's trading from 1942 to 1946. Fletcher testified that he did not handle the proceeds of these sales, except to the extent that he was paid his commission on profits at the end of the year, and that he did not obtain physical possession of any of the stock.

5. The 1946 and 1947 transactions in question concerned seventeen separate items.

the indemnity bond. The insuring clause of the bond provides that:

> "Section 1.—The Maryland Casualty Company \* \* \* agrees to indemnify Sydney Roth \* \* \* T/A Roth & Company, Allentown, Pa. \* \* \* against the direct loss of any property \* \* \* sustained \* \* \* as follows:
>
> "(A)—Through any dishonest act, wherever committed, of any of the Employees, as defined in Section 6 hereof, whether acting alone or in collusion with others."

Section 7 of the bond, containing certain exclusionary language, reads in part as follows:

> "Section 7.—This bond does not cover:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "(f)—Any loss resulting directly or indirectly from trading with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance."

■ Because this is a diversity case we must apply the law of Pennsylvania. Under that jurisdiction's conflict of laws rule an insurance policy is interpreted by the laws of the state where it is contracted and it is contracted where the policy is delivered. Absent proof as to the place of delivery it is presumed that delivery took place at insured's residence. New York Life Insurance Co. v. Levine, 3 Cir., 1943, 138 F.2d 286. We are thus referred to Pennsylvania substantive law. Since the latter is silent on the questions before us we must determine for ourselves how they would be an-

swered had the instant suit been brought in the state courts.

Appellant makes the contention (1) that Fletcher's transactions did not constitute trading within the meaning of the bond and (2) that even if they did the exclusion, above quoted, is not applicable to dishonest acts.

■ The first argument is completely without merit. If what Fletcher did cannot be characterized as trading it is difficult to conceive what that term embraces. Appellant's reasoning on this phase of the case is that because Fletcher was not authorized to enter into these transactions he simply misappropriated Roth's funds and was not trading at all. In other words, appellant seeks to equate "trading" with authorized trading. We are not persuaded that the term should be so restricted. Another facet of this argument which we find equally unrealistic suggests that because Roth maintained both a "trading account" in which his own (Roth's) securities were kept and a "mark-up account" for customers only, trading of securities not related to customers' orders could only be carried on with respect to the former account. Again the premise, which we reject, is that there can be no trading unless it is authorized.[6]

A more impressive argument is made with respect to the second point. We are told that protection against losses arising from acts of dishonesty in trading is the main object of this type of insurance and that the language of the bond indemnifying appellant for the dishonesty of his employees should not be limited by excluding trading losses resulting from dishonesty, since to do so would deny the broker the very protection he contracted for. The sole authority directly in support of appellant's view is Paddleford v. Fidelity & Casualty Co. of New York, 1938, 100 F.2d 606, wherein the Seventh Circuit, in construing a broker's blanket bond containing

---

**6.** If appellant is correct it would make no difference which account Fletcher utilized since a purchase or sale of Roth's own securities in the so-called "trading ac-count" would not, under appellant's view, qualify as "trading" unless authorized, and if authorized would not be dishonest.

language substantially similar to that found here, held that the only trading losses excepted from coverage were those not resulting from the dishonesty of an employee, e. g., those caused by mistake, negligence, failure to record trades, etc. In so holding the court said it was invoking the familiar rule that a construction should be had, if possible, which would effectuate the insurance, not defeat it.

The difficulty with this approach, as we see it, is that it does violence to the plain meaning of the insurance contract. The policy does not purport to embrace losses due to mistake or negligence, hence there is no point in excepting from coverage trading losses due solely to such mistake or negligence. If Section 7(f) is to be given any meaning it must be read to withdraw from the protection offered by Section 1 those losses resulting from trading which but for the exclusionary language would have been included in Section 1. It is our opinion that the words employed leave no doubt that this was intended to be done. We therefore may not apply the rule that ambiguous language is to be construed against the party which drafted it.

There is another ground for rejecting the reasoning of the Paddleford case insofar as it states that the excepting clause should not be permitted to remove the very coverage which the insured sought to obtain. Although Section 1(A) of the policy indemnifies against any dishonest act of insured's employees, Sections 1(B) and 1(C) cover losses to insured's property due to robbery, burglary, larceny, theft, hold-up, damage or destruction while that property is in the offices of insured or in transit. It is thus not quite accurate to say that the effect given to Section 7(f) by the trial court would be to defeat the insurance protection which appellant purchased. In this connection it may be noted that, according to appellee, insurance coverage which includes the trading losses here excepted is available to brokers at a substantially higher premium rate.

Directly contrary to the Paddleford opinion and supporting appellee's position are the cases of Harris v. National Surety Co., 1927, 258 Mass. 353, 155 N.E. 10 and Rath v. Indemnity Insurance Co. of North America, Dist.Ct. of App. 2nd Dist.1934, 2 Cal.App.2d 637, 38 P.2d 435,[7] which the court below correctly followed. Because these decisions are adequately discussed in the district court opinion we will not further labor them except to state that we are in entire concurrence with their reasoning. We also agree with the trial judge that at least some support for his views can be found in the case of Degener v. Hartford Accident & Indemnity Co., 3 Cir., 1937, 92 F.2d 959, 960. There the district court, in an unreported opinion, had held that a trading loss occasioned by fraud[8] was within the exception of a similar exclusionary clause and thus not within the coverage of the policy. On appeal, though the judgment for defendant was affirmed on different grounds, neither the majority nor the dissent questioned the trial court's interpretation of the excepting clause.

The judgment will be affirmed.

---

7. See also Earl v. Fidelity & Deposit Co. of Maryland, Dist. Ct. of App., 2nd Dist. 1934, 138 Cal.App. 435, 32 P.2d 409.

8. Plaintiff sought to recover under a section of the policy which indemnified against loss of money due to "larceny, whether common-law or statutory, robbery, burglary, holdup, theft, or other fraudulent means * * *."