The CONTINENTAL CORPORATION, Plaintiff–Appellee,

v.

The AETNA CASUALTY & SURETY COMPANY, Defendant–Appellant.

No. 88–3165.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1989.

Decided Dec. 22, 1989.*

As Amended on Denial of Rehearing March 14, 1990.

---

\* This opinion was circulated to all the judges in regular active service pursuant to Circuit Rule 40(f) because it overrules a prior decision of this court, *Paddleford v. Fidelity & Casualty Co. of New York,* 100 F.2d 606 (7th Cir.1938). None of the judges favored a rehearing *en banc.*

Christopher T. Kolb, David B. Halling, Halling & Cayo, Milwaukee, Wis., Stanley Block, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiff-appellee.

Francis D. Morrissey, Thomas A. Doyle, Baker & McKenzie, Chicago, Ill., for defendant-appellant.

Before CUDAHY, FLAUM and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

This appeal arises from a diversity action between two major insurance companies involving the interpretation of the terms of a fidelity bond issued by Aetna Casualty & Surety Company ("Aetna") to Continental Corporation ("Continental"). Continental sought indemnification from Aetna for significant losses it sustained due to the malfeasance of a former corrupt employee of its subsidiary, American Title Insurance ("American"). The former employee is now serving time for issuing fraudulent title insurance commitments and policies. The district court ruled that the provision of the fidelity bond excluding losses resulting from contracts of insurance did not apply to the employee's dishonest acts and that, therefore, Continental's losses were covered. The court granted summary judgment to Continental and, in two separate trials involving damages issues,

awarded Continental comprehensive relief, including indemnification of expenses incurred in settling a racketeering conspiracy case filed against American by a competitor. We reverse.

I.

While Michael Maciejewski was employed as a manager at American, he engaged in a real estate fraud scheme with an investor, John Huber. Maciejewski facilitated the scheme by issuing fraudulent and deceptive title insurance commitments and policies that intentionally omitted disclosure of prior mortgages or other encumbrances on property. This practice enabled Huber to trade and mortgage properties without apprising other parties to the real estate transaction (e.g., lenders and buyers) of the true status of the title. Maciejewski resigned from American on March 31, 1983. Two months later, Maciejewski began working for a competitor, Safeco Title Insurance Company ("Safeco"), where he duplicated his earlier scam using Safeco title policies. Eventually the fraud was exposed and Maciejewski and Huber were convicted and sentenced to prison.

Maciejewski's chicanery generated a deluge of claims against American by customers who discovered that their titles or mortgage interests were not as represented in the title policies. American settled these claims for approximately $3.2 million.

Meanwhile, Safeco had filed a racketeering conspiracy suit against American alleging, inter alia, that American was a corporate perpetrator acting in concert with Maciejewski, Huber and others in a scheme to defraud Safeco. Appellant's Supp.App. at 32. Safeco's voluminous complaint charged that American knew of Maciejewski's fraud when Safeco contacted American for a reference on Maciejewski, and that high-ranking American officials actively aided Maciejewski after he moved to Safeco and abetted his schemes there in order to mitigate American's losses. Safeco claimed that American was liable for Maciejewski's perpetration of the real estate fraud scheme under the theory of respondeat superior and as a co-conspirator engaged in unlawful racketeering activity for its own unjust enrichment. The com-

plaint alleged that American was responsible for the "passing of the consequences of the Plan on to ... Safeco as the new deceived title company," which, as a result, suffered significant losses under its own Safeco title policies that were fraudulently issued by Maciejewski while he was employed by Safeco. *See* Appellant's Supp. App. at 56.

Pursuant to a blanket fidelity bond issued by Aetna, Continental sought indemnification from Aetna for the $3.2 million settlement of customer claims arising from Maciejewski's preparation of fraudulent title policies, for related attorneys' fees and for expenses sustained in defending the pending *Safeco* litigation. The fidelity bond at issue is the "Form 25 Insurance Companies Blanket Bond" used by sureties—which are themselves insurance companies—to provide fidelity coverage to members of their own insurance industry. This bond provides that Aetna will indemnify Continental for "loss resulting directly from one or more dishonest or fraudulent acts of an Employee ... whether committed alone or in collusion with others." *See* Insuring Agreement A, Appellant's Supp. App. at 20. The bond expressly defines a covered "employee" to include only persons "employed in, at, or by any of the Insured's offices ... and who are compensated ... and whom the Insured has the right to govern and direct...." Appellant's Supp. App. at 21. The agreement also contains the following indemnification clause:

> The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damages which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond.

*See* Insuring Agreement F.

Of central importance in the present dispute is exclusion (j) of the fidelity bond, which states:

THIS BOND DOES NOT COVER:

(j) Loss or expense resulting from (a) liability of the Insured under contracts or purported contracts of insurance, indemnity, or suretyship, except (1) loss resulting directly or indirectly from liability for the return of unearned premiums upon cancellation of such contracts or (2) loss resulting directly from fraudulent or dishonest acts of an Employee in adjusting or paying fictitious or fraudulent claims asserted under valid contracts of insurance, indemnity or suretyship; or (b) liability of the Insured because an inspection, title search, survey or report was made, not made or improperly made.

*See* Appellant's Supp.App. at 22.

When Aetna refused to indemnify Continental for its extensive losses, Continental commenced this action. Aetna moved for summary judgment on the ground that the losses resulted from fraudulent contracts of insurance issued by Maciejewski and, therefore, were exempt from coverage under exclusion (j) as a matter of law. The district court denied Aetna's motion and suggested instead that, on the contrary, the matter was as a matter of law *covered* under the bond. These observations prompted Continental to move for summary judgment, which the district court granted on the liability aspect of the controversy and then set the case for a trial limited to the issue of damages.

Prior to the damages trial, Aetna issued a subpoena for the deposition of Continental's former vice president, who had chaired the insurance industry committee that had drafted the exclusion (j) language contained in the fidelity bond. Upon motion by Continental, however, the district court quashed the subpoena, reasoning that the testimony was not relevant to the damages trial nor would it affect his decision on a future motion to reconsider the question of liability under exclusion (j). *See* Appellant's App. at 14. Following the litigation of damages issues at a trial conducted on July 14, 1987, the district court denied Aetna's requested reconsideration of the liability issue and ordered Aetna to indemnify Continental for its $3.2 million settlement of claims under the title insurance contracts. The court also awarded

indemnification of Continental's attorneys' fees, including fees incurred in defending the pending *Safeco* case. With respect to *Safeco*-related attorneys' fees, the court concluded without elaboration that, based on a reading of Safeco's complaint, Aetna had an obligation under the bond to provide a defense to the *Safeco* litigation on American's behalf. *See* Appellant's App. at 37.

On October 6, 1987, the *Safeco* litigation was ultimately settled by Continental for $1.85 million and additional reimbursement was sought from Aetna under the bond's indemnification clause. Aetna filed a Rule 16 motion requesting that Continental be required to file an amended complaint incorporating the new *Safeco*-related claims and that Aetna be afforded an opportunity to file responsive pleadings and to engage in discovery relevant to these claims. The court denied Aetna's motion. Aetna also moved for summary judgment on the ground that the bond did not cover losses arising from the *Safeco* settlement. The court denied this motion stating that it had already determined coverage of *Safeco*-related matters at the earlier damages trial. *See* Appellant's App. at 48–49. After a two-day trial on the issue of damages relating to the *Safeco* litigation, the court reiterated that the allegations in Safeco's complaint and assertions made during pretrial proceedings exposed American to liability to Safeco for Maciejewski's dishonest acts while he was an American employee. *See* Appellant's App. at 54. Accordingly, the court awarded Continental recovery for all its *Safeco*-related losses, including the $1.85 million settlement and related attorneys' fees. *Id.* at 52, 59.

On appeal, Aetna's challenge to the district court's disposition of this matter is two-fold. First, Aetna disputes the district court's determination that the losses resulting from Maciejewski's issuance of fraudulent title insurance policies were covered under the fidelity bond notwithstanding exclusion (j). Second, Aetna objects to the district court's ruling that Aetna was liable for indemnification of Continental's losses relating to the settlement of the *Safeco* litigation. With respect to both issues, Aetna contends that it was not liable to Continental as a matter of law and that,

therefore, Aetna was entitled to summary judgment.

## II.

We review a district court's summary judgment determination *de novo*. *Central States, Southeast and Southwest Areas Pension Fund v. Jordan*, 873 F.2d 149, 152 (7th Cir.1989). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The burden is on the moving party to establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### A. *Exclusion (j)*

 Fidelity bonds are indemnity contracts that guarantee reimbursement for losses sustained by the insured resulting from the dishonesty of the insured's employees. Under Wisconsin law, which the parties agree governs this diversity case, the construction of language in an insurance policy is generally a question of law, which may be redetermined independently on appeal. *Bradley Bank v. Hartford Accident & Indemnity Co.*, 737 F.2d 657, 660 (7th Cir.1984) (citing *Kraemer Bros. v. United States Fire Ins. Co.*, 89 Wis.2d 555, 561, 278 N.W.2d 857, 860 (1979)). Construction involves an issue of fact only in "case of ambiguity where words or terms are to be construed by extrinsic evidence...." *Id.*

In interpreting an insurance policy, the court must give the words of the policy their common and ordinary meaning. *See Schmidt v. Luchterhand*, 62 Wis.2d 125, 133, 214 N.W.2d 393 (1974). Where an exclusion is found to be ambiguous, courts generally construe the clause strictly against the drafter/insurance company and liberally in favor of coverage. *See Ark-*

wright–Boston Mfrs. Mutual Ins. Co. v. Wausau Paper Mills Co., 818 F.2d 591, 594 (7th Cir.1987) (citing Garriguenc v. Love, 67 Wis.2d 130, 135, 226 N.W.2d 414, 417 (1975)). However, "[w]here language is plain and unambiguous, the apparent import of the words must govern," RTE Corp. v. Maryland Casualty Co., 74 Wis.2d 614, 621, 247 N.W.2d 171, 175 (1976), and the court will simply apply the exclusion according to its terms without applying principles of strict construction. See Arkwright–Boston Mfrs., 818 F.2d at 594 (citing Lawver v. Boling, 71 Wis.2d 408, 421–22, 238 N.W.2d 514, 521 (1976)).

In accordance with these general dictates of Wisconsin law, our initial inquiry in the present case is whether exclusion (j) is unambiguous; if it is, we are free to construe it as a matter of law. See Bradley Bank, 737 F.2d at 660. According to Wisconsin case law:

> Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction. However, when the terms of a policy are plain on their face, the policy should not be rewritten by construction to bind the insurer to a risk it was unwilling to cover, and for which it was not paid.

Id. (quoting Garriguenc v. Love, 67 Wis.2d at 135, 226 N.W.2d at 417). The test is "what a reasonable person in the position of the insured would have understood the words to mean." Kremers–Urban Co. v. American Employers Ins. Co., 119 Wis.2d 722, 735, 351 N.W.2d 156, 163 (1984).

Aetna contends that exclusion (j) is unambiguous and that the district court therefore erred in failing to enforce it according to the plain and ordinary meaning of its language. Alternatively, Aetna submits that once the district judge deemed the exclusionary clause ambiguous, he should have considered available extrinsic evidence reflecting the parties' intended meaning, such as the proffered deposition testimony of Continental's former vice president, a co-author of the clause.

The district court determined that the terms of the fidelity bond were ambiguous with respect to whether losses caused by a dishonest employee's issuance of fraudulent insurance policies are covered or excluded. Thus, the court said that it was appropriate to apply traditional canons of contract construction and, at least implicitly, the court proceeded to do so. The court recognized that exclusion (j) exempted from coverage losses resulting from contracts of insurance and from improperly made inspections and title searches, and found that Continental's losses did indeed arise out of title insurance issued by American. Appellant's App. at 2, 3. Nevertheless, invoking the reasoning of Paddleford v. Fidelity & Cas. Co. of New York, 100 F.2d 606 (7th Cir.1938), the district court held that, as a matter of law, exclusion (j) was inapplicable to dishonest acts of employees and thus did not preclude coverage of Continental's losses.

We disagree with the district court's construction of exclusion (j). In fact, taking a wholly contrary view, we think the provision clearly and unambiguously excludes coverage of Continental's losses. The language of exclusion (j) unequivocally exempts from coverage losses "resulting from (a) liability of the insured under contracts … of insurance, … or (b) liability of the insured because an inspection, title search, survey or report was made, not made or improperly made." The district court expressly acknowledged that Continental's losses resulted from the issuance of insurance contracts, but then implicitly modified the plain terms of the exclusion to exempt only losses from honestly issued contracts of insurance. Since Maciejewski furnished title insurance contracts dishonestly, the court concluded that his actions were encompassed by the fidelity bond's comprehensive coverage for employee dishonesty and that exclusion (j) was inapplicable. We think the district court erred by drastically qualifying, and virtually rewriting, the plain terms of the bond. Exclusion (j) does not differentiate between honestly procured contracts of insurance and contracts that are dishonestly procured. By contrast, nine of the fifteen exclusions contained in the policy expressly limit and avoid their own exclusionary effect if the

loss arose from employee dishonesty. *See* Section 2(a)–(m) & Special Rider D, Item 1, Exhibit A. Exclusion (j) contains no such limitation.

In radically modifying the plain meaning of exclusion (j), the district court relied on our 1938 decision in *Paddleford v. Fidelity & Casualty Co. of New York*, 100 F.2d 606 (7th Cir.1938). *Paddleford* involved a brokerage firm that engaged in buying and selling stocks, bonds and grain commodities on behalf of its customers. The firm was insured under a blanket fidelity bond for losses resulting from any dishonest acts of its employees. The bond contained a broad exclusion, however, for any losses resulting from trading. This court construed the exclusion to apply only to losses arising out of *honest* trading. The court opined:

> This construction, we think, is reasonable, in view of the nature and character of the business in which plaintiffs were engaged. To us it borders on the preposterous to say that it was the intention of the parties to indemnify plaintiffs against the loss occasioned by a dishonest employee and at the same time make this indemnity unavailing if the loss was occasioned while engaged in trading, the precise business in which plaintiffs were engaged as defendants well knew. It is not consistent with our sense of justice to say that either of the parties intended that the plaintiffs in one breath should be given protection, and in the next, taken way.... [D]efendants' construction would nullify the insuring clause and would reduce the protection afforded by its bond to a mere shadow, irrespective of the fact it was paid a rather substantial consideration.

*Id.* at 613.

The rationale of *Paddleford* has been trenchantly criticized by the Third Circuit in a later case, *Roth v. Maryland Cas. Co.*, 209 F.2d 371 (3d Cir.1954), involving the interpretation of a fidelity bond's exclusionary clause that employed language replicating that in *Paddleford*. In *Roth*, the Third Circuit concluded that the approach in *Paddleford*, differentiating between honest and dishonest trading and holding that losses suffered due to the latter were covered under the bond, did violence to the plain meaning of the insurance contract. The Third Circuit reasoned that the policy's insuring clauses did not in the first instance purport to embrace losses attributable to *honest* trading, *e.g.*, trading losses due to mistake or negligence; hence, there was no point in *excluding from coverage* losses due solely to honest trading. The Third Circuit declined to apply the tenet of contract construction that ambiguous language should be construed against the drafter because, according to the court, the plain words left no doubt what the parties intended: to withdraw from protection those losses resulting from trading which, but for the exclusion, would have been included in the general dishonesty coverage. Finally, the court rejected the reasoning in *Paddleford* that the exclusion should not be read to nullify the very coverage that the insured had sought to obtain. The *Roth* court explained that the bond was not deprived of its very substance since it continued to insure against losses due to theft and related causes and noted that coverage of the trading losses in dispute could be procured at a substantially higher premium rate. *See id.* at 374.[1]

After fifty years of evolution of the fidelity insurance business, we think it appropriate to reexamine our decision in *Paddleford*. We could attempt to distinguish *Paddleford* on various grounds. For example, the present case, unlike *Paddleford*, involves *two* giant insurance companies fully and equally capable of negotiating policy language and of comprehending the terms of an industry-wide fidelity insurance bond form. Moreover, one of the drafters of exclusion (j) was the former vice president of the insured, Continental; hence, the general rule of construing terms against the drafter/insurer and in favor of coverage

---

1. *See also Research Equity Fund v. Ins. Co. of N. America*, 602 F.2d 200, 201 (9th Cir.1979), *cert. denied*, 445 U.S. 945, 100 S.Ct. 1344, 63 L.Ed.2d 780 (1980); *Sutro Bros. & Co. v. Indemnity Ins. Co. of N. America*, 386 F.2d 798, 801 (2d Cir. 1967); *Shearson/American Express, Inc. v. First Continental Bank & Trust Co.*, 579 F.Supp. 1305, 1310–11 (W.D.Mo.1984).

may not be as apt here as in the generality of cases. According to the offer of proof presented by Aetna in the proceedings below, Continental's former vice president would have testified that the exclusion was drafted to enable fidelity carriers to reinstitute bonding in the title insurance business, where the magnitude of the risks had otherwise become prohibitive in the late 1970s. *See* Appellant's Supp.App. at 23–29. Continental was arguably as cognizant as Aetna of the rationale underlying exclusion (j) and of the purported need for limiting some types of losses that might otherwise be charged against a bonding company although supported by an inadequate premium. By contrast, *Paddleford* did not involve two insurance giants on a relatively equal playing field and is thus quite a different case.

While *Paddleford* may be distinguishable on these grounds, we think the reasoning in *Paddleford* is fundamentally flawed and, to the extent it conflicts with the present opinion, *Paddleford* is overruled. In this regard, we concur in the analysis presented by the Third Circuit in *Roth.* The district court's *Paddleford* approach, construing exclusion (j) to apply solely to *honest* contracts of insurance, effectively renders the exclusion surplusage since honest acts are not in any event covered by the bond. The fidelity bond provides indemnification for losses resulting only from *dishonest* employee acts, not mere negligent mistakes, errors or omissions. Thus, relegating exclusion (j) to a mere limitation on nonexistent coverage is an untenable result that defies its plain language as well as common sense.

Further, we do not think *Paddleford* could survive the more recent pronouncements of the Wisconsin courts requiring enforcement of exclusions to accomplish their intended purpose of *subtracting* from otherwise broad coverage. The Wisconsin Supreme Court has recognized that an exclusion in an insurance policy is as much an operative component of the policy as the insuring clause itself and, hence, is entitled to equal enforcement as written. *See D'Angelo v. Cornell Paperboard Products Co.,* 59 Wis.2d 46, 207 N.W.2d 846, 849 (1973). In general, coverage clauses do not modify exclusions; rather, exclusions are expressly intended to modify coverage clauses and to limit their scope. "Exclusion clauses ... put [the insured] on notice that these portions of the policy limit coverage rather than confer it. Such clauses *subtract* from coverage rather than grant it." *Bulen v. West Bend Mut. Ins. Co.,* 125 Wis.2d 259, 371 N.W.2d 392, 394 (Wis. App.1985). *See also D'Angelo v. Cornell Paperboard Products Co.,* 59 Wis.2d 46, 207 N.W.2d 846 (1973); *Racine County Nat'l Bank v. Aetna Cas. & Sur. Co.,* 56 Wis.2d 830, 203 N.W.2d 145, 149 (1973).

Nor do we agree with Continental's argument, as reflected in *Paddleford,* that the exclusion of all losses arising out of contracts of insurance renders the bond nugatory despite costly premiums paid to obtain it. The exclusion does not apply to *all* losses arising out of contracts of insurance; rather, it specifically lists two exceptions that the fidelity bond specifically covers: (1) losses resulting from liability for the return of unearned premiums upon cancellation of insurance contracts;[2] and (2) dishonest acts of an employee in the payment of fictitious claims under valid contracts of insurance. Moreover, the bond encompasses losses due to employee forgery, theft and related causes. *See* Insuring Agreement B.

Finally, we reject Continental's additional inventive arguments. Interestingly, Continental forsakes the district court's approach (*i.e.,* finding the policy terms ambiguous and implicitly applying a construction against the insurer to hold that exclusion (j) applies only to honestly created insurance contracts). Instead, Continental argues that, because the express terms of the bond cover losses resulting from dishonest acts of an employee and because the "cause," "starting point," and "source or original moving force" of Continental's

---

**2.** For example, if Continental discovered a dishonest employee's fraudulent policy issuing scheme and cancelled the policies early to avoid

later claims, Aetna would indemnify losses due to the refund of premiums on these fraudulent policies.

losses was indeed Maciejewski's dishonesty, the plain and unambiguous language of the bond dictates coverage. According to Continental's rather unconvincing causation theory, its liability on the insurance policies was merely an incidental by-product of Maciejewski's dishonesty and, thus, exclusion (j) is inapposite. Alternatively, Continental contends that, assuming that Continental's losses resulted in part from the issuance of insurance contracts, full coverage nevertheless exists because when a covered risk (dishonesty) and an excluded risk (fraudulent insurance contracts) both contribute to a loss, coverage should prevail. *See Kraemer Bros., Inc. v. U.S. Fire Ins. Co.*, 89 Wis.2d 555, 278 N.W.2d 857, 863–64 (1979). Finally, Continental suggests that the losses were attributable to tort liability created by Maciejewski's dishonest acts rather than to liability under contracts of insurance and, therefore, are not excluded from coverage under the bond.

We are not persuaded by Continental's subtle arguments. We think it incontrovertible that the losses in question here resulted from contracts of insurance. Indeed, the district court so found. To characterize Continental's contract liability as an incidental by-product of an employee's dishonesty or to re-label Continental's losses as tort derivatives is merely a semantic exercise to avoid the plain meaning of the insurance policy. Based on the record before us, any tort claims arose from misrepresentations contained in the contracts of insurance and title reports, as contemplated by exclusion (j). In addition, we think Continental's causation theory is misguided. The underlying cause of Continental's losses is admittedly employee dishonesty. But because the mechanism by which that dishonesty caused loss was through fraudulent title policies and improper title reports, the losses are excluded from coverage by operation of exclusion (j).

Counsel for Aetna vigorously asserted at oral argument that the essence of exclusion (j) is that fidelity carriers have chosen to be in the *fidelity* business, not the title insurance business. The exclusion apparently allocates two types of losses resulting from

employee dishonesty—misappropriated premiums and false claim payments—to the fidelity carrier, and assigns the remaining core title insurance risk resulting from employee dishonesty in creating title reports and insurance contracts to the title carrier. There is no sound reason to torture the plain and unambiguous language of the policy to nullify this contractual allocation of risk.

Therefore, because we conclude that the losses relating to claims under the fraudulent insurance contracts were excluded from coverage as a matter of law, we reverse the district court's orders granting summary judgment and damages to Continental with respect to these losses and its order denying Aetna's motion for summary judgment. In addition, we remand with instructions that the district court award summary judgment on this branch of the case to Aetna.

## B. *Safeco Settlement*

■ Insuring Agreement F of the fidelity bond provides that Aetna will indemnify Continental against "reasonable attorneys' fees incurred ... in defending any suit ... brought against [Continental] to enforce [its] liability or alleged liability on account of any loss, claim or damages which, if established ..., would constitute a valid and collectible loss ... under ... this bond." Aetna argues that the district court erred in concluding that this indemnification clause obligated it to reimburse Continental for its costs in settling the *Safeco* litigation.

We note at the outset that, as far as we can ascertain from the record, the district court apparently did not thoroughly consider the issues pertinent to the *Safeco*-related losses, in particular, the pivotal issue whether the losses were covered under the terms of the bond. The court initially encountered the *Safeco* case at the "damages" trial involving the fraudulent insurance contract claims. There the court awarded Continental its request for aggregated attorneys' fees, which included fees in connection with the payment of claims under the insurance contracts as well as costs incurred in defending the ongoing *Safeco* litigation. *See* Appellant's App. at

24. After the *Safeco* case was settled, the court refused to allow new pleadings and discovery with respect to Continental's additional request for reimbursement for the *Safeco* settlement. In addition, the court denied Aetna's motion for summary judgment on the new *Safeco* claims, concluding somewhat perfunctorily that the fidelity bond covered all *Safeco*-related losses.

Whether the *Safeco* settlement expenses constituted covered losses again presents a question of law involving the interpretation of the indemnification provision in the fidelity bond. Safeco must have sought recovery for a covered loss in order for Aetna to be held liable for indemnification. *See Luria Bros. & Co. v. Alliance Assur. Co.*, 780 F.2d 1082, 1091–92 (2d Cir.1986); *Shearson/American Express, Inc. v. First Continental Bank and Trust Co.*, 579 F.Supp. at 1314; *Aetna Casualty and Surety Co. v. Southern Brokerage Co.*, 443 S.W.2d 45 (Tex.1969). The terms of the bond provide coverage only for losses "resulting directly from" the dishonest or fraudulent acts of an *American employee*, and defines "employee" to include only persons "employed in, at, or by any of the Insured's offices, and who are compensated ... and whom the Insured has the right to control." Appellant's Supp.App. at 21. Once a covered employee terminates his employment at American, the bond extends coverage only if American sustains "a loss through [the employee's] dishonest or fraudulent act committed within the next sixty days immediately succeeding the termination of his employment and such loss would have been covered under this bond except for such termination...." *See* Section 13. Otherwise, dishonest acts of a former employee are not covered under this bond. *See Bay Ridge Air Rights, Inc. v. Franklin Nat'l Bank*, 62 A.D.2d 961, 404 N.Y.S.2d 22 (1978).

Aetna argues that the district court erred in denying its summary judgment motion on this aspect of the case because, as a matter of law, the *Safeco*-related losses were outside the coverage provided under the bond. We agree. Safeco's alleged injuries did not occur when Maciejewski was an American employee; thus, we cannot conclude that the *Safeco* settlement "result[ed] *directly* from" Maciejewski's conduct as an American employee, as required by the terms of the bond. *See* Appellant's Supp.App. at 68–69, 111–18 (emphasis added). The district court found that the allegations contained in the complaint and the assertions made by Safeco in pretrial proceedings exposed American to liability for Maciejewski's dishonest acts while he was an American employee because "[b]ut for the dishonest acts committed by Maciejewski while employed at American Title, Continental would not have been faced with the Safeco lawsuit or the need to settle that case." Appellant's App. at 54. We think that the district judge's "but for" analysis is faulty and undermines the validity of his conclusions on this issue. Safeco's injuries, as alleged in the complaint, resulted from fraudulent Safeco title policies and commitments issued by Maciejewski *while he was an employee of Safeco*, not American. Each of these transactions occurred several months after Maciejewski had terminated his employment at American. While the *Safeco* complaint does refer to pre-termination conduct of Maciejewski in its description of his role in devising a real estate fraud scheme involving American title policies and in its characterization of the racketeering conspiracy charge against American, Maciejewski and others, Continental has not directed us to any allegations in the complaint or any evidence of a loss suffered by Safeco resulting *directly* from a dishonest act committed by Maciejewski during his tenure at American.[3] Only through the

---

3. In its petition for rehearing, Continental points out that the policy's requirement of "direct injury" applies to the insured, American, rather than to the third party, Safeco. Continental argues that the injury may be "indirect" as to Safeco yet "direct" as to American (the employer). Although the matter becomes a bit metaphysical, we believe that, if an injury to Safeco were only

"indirect", consequential injury to American as the party required to reimburse Safeco for its "indirect" injury would necessarily be "indirect" with respect to Maciejewski, the original source of the chain of injury. Hence, the requirements of the bond would not be met.

Incidentally, we do not believe, despite Continental's apparent concern that we might, that

most tortuous causal chain could actions of Maciejewski committed at American be deemed even marginally relevant to Safeco's losses—but the bond clearly requires a "direct" causal connection.[4] The specific conduct directly causing Safeco's alleged injuries consisted entirely of post-termination acts by Maciejewski in issuing Safeco policies. The Aetna policy by its express terms does not purport to promise indemnification for losses resulting from dishonest acts of former employees committed several months after they leave American. Because the *Safeco* case sought recovery for matters which did not constitute a covered loss under the bond as a matter of law, Continental was not entitled to indemnification for its expenses incurred in settling the *Safeco* litigation.[5] Hence, we reverse the district court's decision awarding Continental indemnification as well as the court's denial of Aetna's motion for summary judgment on the issue of *Safeco*-related liability.

### III.

For the reasons set forth in this opinion, we reverse the district court's award of summary judgment and damages to Continental, and remand with instructions that summary judgment be entered in favor of Aetna on all issues of liability.

REVERSED AND REMANDED WITH INSTRUCTIONS.

---

American's payment of the *Safeco* settlement was *necessarily improvident;* we merely believe it not to be a covered loss.

4. If Safeco, *arguendo,* had alleged an injury resulting from Maciejewski's dishonesty in issuing fraudulent policies during his employment at American, Continental's settlement of this claim might well be exempt from coverage under the bond pursuant to exclusion (j).

5. Aetna also argues that the *Safeco* settlement was not a covered loss because the allegations contained in the complaint charged American with racketeering, unjust enrichment, management ratification and perpetration of Maciejewski's fraud—all matters outside the coverage of the fidelity bond. A fidelity bond does not cover the insured's own willful, knowing or fraudulent conduct. *See Omaha Bank for Cooperative v. Aetna Casualty & Surety Co.,* 207 Neb. 782, 301 N.W.2d 564, 569 (1981). The bond is aimed at covering losses that employees intend to cause their employer, not losses involving fraudulent practices directed against customers that serve to benefit an employer acting in concert with the employee. The bond's definition of dishonesty specifically requires a manifest intent by the employee to cause his employer a loss. Aetna contends that the *Safeco* complaint was the antithesis of that which bonding companies insure. We think this contention of Aetna's provides an additional independent basis for excluding the Safeco settlement from coverage. Moreover, certain allegations of the *Safeco* complaint—notably the charge of launching a plan or scheme which ultimately injured Safeco—presumably involved a time period when Maciejewski was still an American employee. But this would not result in coverage for American since, as explained above, the allegations describe an employer acting *in concert* with Maciejewski and other employees, and, therefore, not an employer in a position to claim the protection of a fidelity bond. In short, Continental's hypothesis that there are "covered" and "uncovered" claims which it is Aetna's burden to sort out is not supported by any reasonable construction of the complaint as a whole. In fact, the concerted nature of the allegations is so dominent and pervasive as to make inappropriate any search between the lines of the complaint for an allegation of conduct of Maciejewski, while an American employee, which is at the same time directed against American yet ultimately a legal cause of injury to Safeco.