165 F.3d 33
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
David A. STRAZ, Jr., Plaintiff-Appellant,
v.
THE KANSAS BANKERS SURETY CO., Defendant-Appellee.
 No. 97-4245.
 United States Court of Appeals, Seventh Circuit.
 Argued May 28, 1998.
Decided Aug. 18, 1998.
 
 Appeal from the United States District Court for the Eastern District of Wisconsin. No. 96 C 855. Charles N. Clevert, Judge.
 Before Hon. JOEL M. FLAUM, Hon. DANIEL A. MANION, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 The First Bank trust department improperly invested St. Catherine's Hospital's money in volatile derivative securities. To say the least, the risky investment did not pan out. In fact, St. Catherine's lost over a million dollars. First Bank settled with St. Catherine's, and then assigned its insurance claim to the plaintiff, who wanted First Bank's insurer, Kansas Bankers Surety Company, to pick up the tab. The district court granted summary judgment in favor of Kansas Bankers. We conclude that because the insurance policy excluded losses related directly or indirectly to trading securities, the insurer had no obligation to defend or indemnify First Bank, and thus affirm.
 
 I.
 
 2
 In 1992, St. Catherine's Hospital, Inc. of Kenosha, Wisconsin invested about $7 million with the First Bank Southeast N.A. trust department. In February 1994, the bank began aggressively investing this money in volatile derivative securities. These securities involved pooled mortgage funds, and were highly sensitive to changes in the market interest rate. Buying the high risk securities violated St. Catherine's instructions, which were to invest the securities in "safe" government securities, where the principal would not be at risk. Unfortunately, as soon as First Bank bought the volatile securities, interest rates began to climb, thus driving down the value of the securities. Within five months, the hospital's account at First Bank had lost $1.1 million. Eventually, St. Catherine's sued First Bank for breach of fiduciary duty. First Bank sought defense and coverage from Kansas Bankers Surety Company, its insurer, under an insurance policy covering directors' and officers' errors and omissions (which also covered the bank's liability for errors involving written trusts). This policy covered wrongful acts, including breaches of fiduciary duty, but excluded "losses resulting directly or indirectly from trading" securities. Kansas Bankers concluded that the $1.1 million loss was the result of trading securities, and therefore refused to defend or cover First Bank.
 
 
 3
 First Bank settled with St. Catherine's for $1.4 million ($1.1 million loss plus $300,000 in attorneys' fees and costs). Then First Bank (or more accurately, its successor, Firstar Bank) assigned its possible insurance claim against Kansas Bankers to David Straz, Jr., chairman of First Bank's board of directors. Straz had previously agreed to personally indemnify certain liabilities, including this one, as part of the Firstar-First Bank merger; Straz is the real party-in-interest. Straz sued Kansas Bankers on the policy, seeking recovery of the $1.4 million settlement and the cost of defense. Kansas Bankers eventually removed this lawsuit to the Eastern District of Wisconsin as a diversity action. After discovery, the district court granted Kansas Bankers summary judgment. It found that the insurance policy excluded liability for losses sustained "directly or indirectly from the trading of securities."
 
 
 4
 Straz appeals. He contends that the trading loss exclusion did not apply to all of the claims raised by St. Catherine's Hospital and that therefore, Kansas Bankers had the duty to defend First Bank because of the nature of some of the allegations in St. Catherine's complaint. Straz acknowledges that if all of the damages St. Catherine's sought were sustained directly or indirectly from the trading in securities, Kansas Bankers has no obligation to provide coverage. However, to the extent that St. Catherine's sought losses unrelated to the trading of securities, Kansas Bankers would have breached its duty to defend First Bank from suit (and would be estopped from contesting coverage).
 
 II.
 
 5
 Wisconsin law governs this diversity suit. The interpretation of an insurance policy is a question of law, which, like a grant of summary judgment, is reviewed de novo. Davis v. Allied Processors, Inc., 214 Wis.2d 294, 571 N.W.2d 692, 694 (Wis.Ct.App.1997). Insurance policies are construed just like other contracts. Donaldson v. Urban Land Interests, Inc., 211 Wis.2d 224, 564 N.W.2d 728, 731 (Wis.1997). In the absence of an ambiguity, we apply the plain meaning of the contract terms in accordance with the reasonable expectations of the insured. See, e .g., Davis, 571 N.W.2d at 694 ("Absent an ambiguity, the plain language of the contract controls.") (citing Brown v. Maxey, 124 Wis.2d 426, 369 N.W.2d 677, 686 (1985)). To resolve the issue of coverage, "we look only at the allegations of the complaint." Atlantic Mut. Ins. v. Badger Medical Supply, 191 Wis.2d 229, 528 N.W.2d 486, 491 (Wis.Ct.App.1995). But the duty to defend is broader than the duty to provide coverage.[1] The insurer must defend its insured if it is at least "arguable" that coverage exists under the policy, even if the claim eventually proves to be meritless. General Casualty Co. of Wisconsin v. Hills, 209 Wis.2d 167, 561 N.W.2d 718, 722 n. 11 (Wis.1997).
 
 
 6
 Thus, both coverage and the duty to defend will depend on whether the allegations in St. Catherine's complaint are arguably covered by Kansas Banker's insurance policy. St. Catherine's Hospital alleged that First Bank breached its fiduciary duty in several ways: by purchasing securities inappropriate for St. Catherine's investment purposes, by concealing the purchase of the derivative securities, and by failing to disclose the true nature of the investment after its purchase. [R.1 Complaint, exhibit b] St. Catherine's sought $1.1 million in damages, equal to the diminution of the principal invested with First Bank, plus attorneys' fees and lost interest. Given these allegations, we must review the terms of the insurance policy to determine whether coverage was "fairly debatable." Elliott v. Donahue, 169 Wis.2d 310, 485 N.W.2d 403, 406 (Wis.1992).
 
 
 7
 The insurance policy covers wrongful acts, including breaches of duty. However, the trading loss exclusion clause provides that
 
 
 8
 The Underwriter [Kansas Bankers] shall not be liable to make any payment or provide any defense in connection with any claim made against the Directors or Officers ... for loss resulting directly or indirectly from trading, with or without the knowledge of the Directors or Officers, ... and notwithstanding any act or omission on the part of any employee in connection with any account relating to such trading, indebtedness or balance....
 
 
 9
 (Emphasis added.) "Loss" is defined broadly: "Loss shall mean any amount which the Directors and Officers are legally obligated to pay or for which the Bank may be required or permitted by law to pay as indemnity ..."
 
 
 10
 Other courts have interpreted this exclusion to apply to losses occasioned by bad trading, even if the trading was unauthorized, as it was in this case. See, e.g., Shearson/American Express Inc. v. First Continental Bank, 579 F.Supp. 1305, 1308 (W.D.Mo.1984) (no insurance coverage for unauthorized trading by vice-president of bank); Roth v. Maryland Cas. Co., 209 F.2d 371 (3d Cir.1954) (same). The trading-loss exclusion also applies to losses occasioned by a fluctuation in market value and ill-advised or unlucky trading decisions. Glusband v. Fittin Cunningham & Lauzon, Inc., 892 F.2d 208, 211-12 (2d Cir.1989). It is only where the loss has no connection to actual trading that the exclusion has no application. Thus, in Insurance Co. of North America v. Gilbralco, 847 F.2d 530, 533 (9th Cir.1988), the Ninth Circuit found that where a trader who stole his clients' funds for his own personal use and had not engaged in any trading, the clients' damages were not sustained directly or indirectly from trading in securities. We believe that the Wisconsin Supreme Court would follow the law as stated in these cases. See, e.g., Continental Corp. v. Aetna Cas. & Surety Co., 892 F.2d 540, 546 (7th Cir.1989) (applying Wisconsin law) (relying on Roth v. Maryland Cas. Co., 209 F.2d 371 (3d Cir.1954)).
 
 
 11
 This court concludes that all of the losses alleged to have been suffered by St. Catherine's resulted directly or indirectly from trading in securities. St. Catherine's sought return of its principal, and other amounts directly related to the lawsuit (which was prompted by those losses) and the interest lost as a result of the unauthorized trades. The diminution in the amount of St. Catherine's principal is directly related to the rise in interest rates, and the reciprocal decline of the value of the derivative securities. And all other losses, interest and attorneys' fees, were at least indirectly related to the drop in the value of the derivative securities.
 
 
 12
 Straz points to the many different theories of liability contained in St. Catherine's complaint, and suggests that even if the losses had not been sustained, First Bank still would have breached its fiduciary duties. In a similar vein, he argues that St. Catherine's complaint alleged that the breach of fiduciary duty caused the damages, and not the trade per se. We agree, but this argument does not change the fact that all of St. Catherine's damages were sustained, at least indirectly, because of the loss in value of the derivative securities. Had interest rates fallen, instead of risen, St. Catherine's would have suffered no damages, and therefore have had no claim against First Bank, even though First Bank breached its fiduciary duty by investing in high risk securities. But no matter how improvident, negligent or fraudulent First Bank's actions were, St. Catherine's sustained losses because First Bank bought securities which diminished in value. The trading loss exclusion can have no other purpose than to insulate Kansas Bankers against risks in the marketplace, and in this case, the losses suffered by St. Catherine's were risks in the marketplace which materialized.
 
 
 13
 As noted at oral argument, First Bank could have purchased a policy covering market risks or activity related to trading securities (at a higher premium, of course). But it chose not to, and our task is to apply the contract the parties agreed upon, not fashion a new one. Amidzich v. Charter Oak Fire Ins. Co., 44 Wis.2d 45, 170 N.W.2d 813, 817 (Wis.1969) (courts "do not have the prerogative to engage in the equitable redrafting of contracts when the terms of those contracts are plain on their face.").
 
 
 14
 Moreover, St. Catherine's complaint clearly sought damages which were directly or indirectly related to trading securities. The only request for damages in the complaint states that St. Catherine's "has lost over $1,100,000 in the Sinking Fund; it has lost interest on the money that should have earned; it has incurred attorneys' fees and other costs." All of these losses are related directly or indirectly to the trading of the derivative securities. We also note that the insurance policy defines loss as including "damages, judgments, settlements, costs, and costs of investigation." Certainly, this broad definition includes lost interest, attorneys' fees, and costs. As the nature of St. Catherine's damages was apparent on the face of the complaint, and all of the losses complained of resulted directly or indirectly from trading securities, coverage was not "fairly debatable." Rather, the trading-loss exclusion applied, and Kansas Bankers had no duty to defend First Bank.
 
 
 15
 Straz's counter arguments are unavailing. For example, he argues that the policy must be construed against the insurer and in favor of coverage. He further argues that First Bank's concealment of the derivative securities and other breaches of fiduciary duties were viable causes of action, independent of the trading. While this may well be true, no matter how we construe the insurance policy and St. Catherine's complaint, the bottom line is that St. Catherine's losses resulted at least indirectly from trading securities. They have also resulted directly from a breach of fiduciary duty, but this does not render the trading-loss exclusion inapplicable. Cf. Continental Corp. v. Aetna Cas. & Surety Co., 892 F.2d 540, 547 (7th Cir.1989) (applying Wisconsin law) ("The underlying cause of Continental's losses is admittedly employee dishonesty. But because the mechanism by which that dishonesty caused loss was through fraudulent title policies and improper title reports, the losses are excluded from coverage by operation of [the exclusion pertaining to losses from title policies].")
 
 
 16
 In sum, the district court properly granted summary judgment to Kansas Bankers based on the trading-loss exclusion of the insurance policy. Furthermore, given the allegations in St. Catherine's complaint, Kansas Bankers had no duty to defend First Bank.
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 Before the district court, Kansas Bankers argued that its policy did not contain any requirement to provide its insured with a defense (contending that it had issued an "indemnity" policy, not a "liability" policy). The district court found that because the policy required Kansas Bankers be notified of a claim, and the right to approve settlements, that under Wisconsin law, this policy was a liability policy which implicitly includes the duty to defend. In light of our disposition of this case, we do not reach this issue, and express no opinion on the merits of it